**Mary E. DEMGEN, individually and as Trustee for the Next of Kin of Baby Boy Martin Keller Demgen, Decedent, et al., Appellants,**

v.

**FAIRVIEW HOSPITAL and Healthcare Services, d/b/a Fairview Riverside Medical Center and a/k/a Fairview–University Medical Center–Riverside Campus, et al., Respondents.**

No. C8–00–705.

Court of Appeals of Minnesota.

Jan. 2, 2001.

John G. Engberg, Mark W. Bay, Peterson, Engberg & Peterson, Minneapolis, MN, (for appellants).

Kay Nord Hunt, Phillip A. Cole, Sheila A. Bjorklund, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN, (for respondents).

Considered and decided by RANDALL, Presiding Judge, CRIPPEN and KALITOWSKI, Judges.

## OPINION

RANDALL, Judge

Appellants Mary E. Demgen, individually and as trustee for the next of kin of Baby Boy Martin Keller Demgen, and Martin A. Demgen challenge the district court's dismissal of their medical malpractice action for failure to comply with the expert affidavit requirements in Minn.Stat. § 145.682 (2000). Appellants contend the district court erred in determining that the expert affidavit they submitted did not meet the statutory requirements. We agree.

## FACTS

When Mary Demgen was approximately 36 weeks pregnant, she started noticing decreased fetal movement. On August 7, 1996, Demgen called Michael Pleasants, M.D. to report the decreased movement. Dr. Pleasants is a family practice physician, and he was on call in place of Demgen's primary care doctor. Dr. Pleasants told Demgen to conduct a fetal movement

count at home, and if she did not feel four to five movements within 20 to 30 minutes, she should go to Fairview Riverside Medical Center's labor and delivery unit. Demgen continued to notice decreased fetal movement, so she left for Fairview. On the way to Fairview, Demgen felt some movement from the fetus.

At Fairview, Demgen was evaluated by the attending nurse, Margaret Mesaros. At 7:38 p.m., an external fetal monitor was applied to Demgen to verify fetal heart activity. From the beginning, the reading was abnormal, with markedly decreased beat-to-beat variability and no reassuring fetal heart rate accelerations. Mesaros, however, did not indicate on the medical records that there was poor heart tracing. At 7:50 p.m., Mesaros called Dr. Pleasants. Both Dr. Pleasants and Mesaros said that they did not remember the details of that conversation. There is no indication in the medical records that this conversation resulted in an attempt to use alternative means to assess the status of the fetus.

The external fetal monitor continued to verify fetal heart activity until 8:31 p.m., when all signs of fetal heart tones were lost. A subsequent ultrasound found no fetal cardiac activity and a diagnosis of intrauterine fetal demise was made.

About one week later, on August 15, 1996, Demgen delivered a stillborn male. Oligohydramnios (low amniotic fluid) was diagnosed at the time of delivery. An autopsy on August 16, 1996, established that the umbilical cord had a true knot.

Appellants filed a medical malpractice claim on August 3, 1998, against respondents Fairview Hospital and Healthcare Services, Dr. Pleasants, Preston Williams, M.D., and Mesaros. All claims against Dr. Williams were subsequently dismissed.

On February 3, 1999, appellants served respondents with an affidavit of expert identification, listing Douglas Soderberg, M.D. as appellants' medical expert. On June 23, 1999, respondents served appellants with an affidavit of expert identifica-

tion, listing Virginia Lupo, M.D. as their medical expert. On July 28, 1999, respondents made a motion for dismissal pursuant to Minn.Stat. § 145.682, subd. 6 (2000), and a motion for summary judgment for failure to establish a prima facie case of medical malpractice. On August 10, 1999, appellants served respondents with a supplemental affidavit from Dr. Soderberg, responding to Dr. Lupo's affidavit.

Following a motion hearing, the district court dismissed appellants' claims, relying solely on Minn.Stat. § 145.682, subd. 6. The district court did not rule on the summary judgment motion.

## ISSUES

1. Did the district court err in dismissing appellants' medical malpractice claim under Minn.Stat. § 145.682 (2000)?

2. Did the district court err by relying on autopsy reports and the rebuttal affidavit of respondents' expert in determining that appellants' expert affidavit was inadequate?

## ANALYSIS

### I. Sufficiency under Minn.Stat. § 145.682, subd. 4(a)

■ An appellate court will not reverse dismissal of a suit pursuant to Minn.Stat. § 145.682 (2000), absent a showing that the district court abused its discretion. *Anderson v. Rengachary*, 608 N.W.2d 843, 846 (Minn.2000). Minn.Stat. § 145.682 requires plaintiffs to file two separate affidavits in medical malpractice cases. Our focus in this case is on the second affidavit, sometimes called the affidavit of expert identification. Within 180 days after the commencement of a medical malpractice action, the plaintiff must serve upon the defendant an affidavit that

must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or

causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Minn.Stat. § 145.682, subd. 4(a). Failure to comply with the affidavit requirements is grounds for mandatory dismissal with prejudice. *Id.*, subd. 6.

■ The affidavit must contain more than just the facts found in the hospital or clinic record; conclusory statements are insufficient. *Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552 at 555–56 (Minn.1996). Rather, the plaintiffs

must set forth, by affidavit or answers to interrogatories, specific details concerning [the] experts' expected testimony, including the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation that allegedly resulted in damage to them.

*Sorenson*, 457 N.W.2d at 193. The expert's affidavit may not simply be read in connection with the death certificate, because doing so would constitute improper reliance on the mere facts in the hospital record. *Stroud*, 556 N.W.2d at 556.

The supreme court addressed the adequacy of the expert's affidavit in another case involving a stillborn baby, *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572 (Minn.1999). Debra Lindberg was pregnant and receiving prenatal care from Group Health. *Id.* at 573. One morning, she experienced symptoms which caused her concern. *Id.* She called Group Health and was advised that she did not need to go to her clinic. *Id.* The next day her symptoms worsened, but Group Health again advised her not to go to the clinic. *Id.* at 574. Shortly thereafter, her symptoms worsened even further, and she was told to go to a hospital. *Id.* Upon arrival, her baby was delivered stillborn. *Id.* A medical malpractice action was commenced against Group Health and others. *Id.*

Within the required 180–day period, the trustee-plaintiff served an expert affidavit. *Id.* The affidavit set forth the expert's opinion, in part, as follows:

4. Based upon a reasonable degree of medical certainty, it is more probable than not, that if, among other things, Debra Lindberg had been instructed to seek medical treatment at the time of her phone call on the morning of March 28, 1994, [the baby] would not have died.

5. Based upon a reasonable degree of medical certainty, [the baby] died as a result of the negligent and careless conduct of the Defendants * * *.

*Id.* at 575. The district court granted defendants' motion to dismiss on the basis that the plaintiff failed to comply with section 145.682. *Id.* This court reversed, holding the affidavit was sufficient. *Id.* at 576. The supreme court reversed and held that the affidavit was inadequate with the statute. *Id.* at 578. In so holding, the court noted that strict compliance with the statute "requires far more information than simply identification of the expert intended to be called at trial." *Id.*

■ Unlike *Lindberg*, the district court in this case found that the expert affidavit [1] sufficiently identified the applicable nursing standard of care and the manner in which the treatment provided deviated from that standard of care. But, it found that the affidavit was inadequate on the issue of the "chain of causation:"

Dr. Soderberg goes on to make the broad, conclusory statement "[f]ailing to have the appropriate tests completed was a direct cause of the fetus' death. The deviation from the standard of care specified above caused the demise of Mrs. Demgen's fetus."

In finding that Dr. Soderberg's affidavit provided only broad conclusory statements, the district court improperly fo-

---

1. The full text of Dr. Soderberg's affidavit is set out in the appendix at the end of this opinion.

cused on two specific sentences in the affidavit instead of reading the affidavit as a whole.

We conclude that Dr. Soderberg's lengthy and detailed affidavit provided much more. In relevant part, it set out a precise explanation of why respondents' failure to follow the applicable standard of care caused the death of the fetus:

a. There was a deviation from the standard of care in evaluating the status of Mrs. Demgen's fetus upon her admission to Fairview Riverside Medical Center Labor and Delivery on August 7, 1996. It is highly unusual for a fetus to die while undergoing fetal heart rate tracing in Labor and Delivery. When the non-reassuring fetal heart rate tracing is indicated at inception of admission, further evaluation should have been performed. The applicable standard of care requires that a doctor be immediately called in to do further testing to assess the status of the fetus. Failing to immediately involve a doctor based on the heart rate tracing present in this case deviated from the standard of care. The fact that the medical records show absolutely no comments on the poor heart tracing or any attempt to assess the status of the fetus in any other manner during the entire period of heart rate tracing indicates a deviation from the applicable standard of care. Nowhere in the medical records is there any evidence that the Labor and Delivery nurse was at all concerned by the very abnormal heart rate tracing, even though the patient had been admitted because of decrease[d] fetal movement. Examination of Exhibit C indicates that the Labor and Delivery nurse was aware that this was the reason for admission.

b. The applicable standard of care under the circumstances of this case would dictate that a fetal acoustical stimulation test or another type of fetal stimulation test or an immediate bedside ultrasound should have been performed.

c. Had the ultrasound test been performed, it would have revealed abnormally low amniotic fluid levels (i.e., the presence of Oligohydramnios). In combination with the markedly abnormal fetal heart rate tracing, this finding would dictate the need for an immediate caesarean section.

d. In a hospital comparable to that at issue, the applicable standard of care would dictate that such an emergency caesarean section be accomplished within 53 minutes, prior to this fetus dying. The failure to have the appropriate tests completed delayed having a caesarean section performed. Failing to have the appropriate tests completed was a direct cause of the fetus' death. The deviations from the standard of care specified above caused the demise of Mrs. Demgen's fetus.

e. Had such an emergency caesarean section been timely performed, a live birth would have resulted. The applicable standard of care would dictate that the procedures specified above, including delivery by caesarean section, should have been completed prior to the cessation of the fetus's cardiac activity, as indicated on the monitoring strip.

If this affidavit, taken as a whole, does not meet the requirements of Minn.Stat. § 145.682, subd. 4(a), this court questions "whether any expert affidavit ever will?"

Regarding negligence and causation, Dr. Soderberg's affidavit states that: (a) the applicable standard of care required the nurse to immediately involve a doctor to further assess the highly unusual fetal heart rate tracing; (b) the applicable standard of care required a fetal acoustical stimulation or a bedside ultrasound; (c) the ultrasound would have revealed the presence of oligohydramnios (abnormally low amniotic fluid levels); (d) the combination of these findings would require an immediate caesarean section; (e) failure to administer the appropriate tests delayed a caesarean section; (f) "[h]ad such an emergency caesarean section been timely per-

formed, a live birth would have resulted"; and (g) if appellants had followed the applicable standard of care, including delivery by caesarean section, the fetus would have been born "prior to the cessation of the fetus's cardiac activity." Unlike the conclusory statements in *Lindberg*, Dr. Soderberg's affidavit provided an explanation of the standard of care, the nurse's specific deviations from the standard of care, and a chain of causation resulting from the deviation. *Compare Sorenson*, 457 N.W.2d at 192–93 (holding that affidavit stating defendant failed to properly evaluate and diagnose was inadequate), with *Haile v. Sutherland*, 598 N.W.2d 424, 427 (Minn. App.1999) (holding that affidavit not signed by expert, lacking expert credentials, standard of care, specific alleged deviation from standard, and causal connection, and which merely recited known facts from medical records was inadequate to satisfy statute). Therefore, the district court abused its discretion by dismissing appellants' lawsuit based on the sufficiency of the affidavit.

■ The medical malpractice statute was created to help the court system identify frivolous claims. *See Stroud*, 556 N.W.2d at 555. The legislature has not declared that all medical malpractice claims are against public policy.

An examination of the history and purpose of Minn.Stat. § 145.682 is helpful. The legislation resulted from intense pressure by the medical industry to reduce what it terms "frivolous lawsuits." *See* Jason Leo, Case Analyses: Recent Decisions of the Minnesota Supreme Court, 27 Wm. Mitchell L.Rev. 1399, 1403–05 (2000) (stating that medical malpractice legislation was enacted to limit the number of lawsuits brought each year). However, "frivolous" is subjective. Usually, frivolous lawsuits are those that have minor and/or wholly subjective injuries. They may be the result of emotions running high, such as neighbor fence yard disputes; or apartment dwellers litigating "your dog is chasing my cat;" propound a new or bizarre cause of action, etc. In short, frivolous suits may prompt courts and others to wonder "where in the world did this one come from!?"

By contrast, an examination of the facts in cases involving the expert affidavit requirements of Minn.Stat. § 145.682 reveals that they tend to involve serious injuries, claims of wrongful death, stillborn babies, the expense and pain of second operations, improperly set limbs, comas, paralysis, etc. alleged to result from improper medical care. This is, by no means, an exclusive list. Noted author Susan Sontag observed once "[e]veryone who is born holds dual citizenship, in the kingdom of the well and in the kingdom of the sick." Mary Pipher, *Another Country* 28 (1999).

In general, claims of medical malpractice, including this one, involving a stillborn birth, tend not to arise over frivolous and/or inconsequential injuries. The reasons that courts tend to see only malpractice cases involving more serious injuries are varied and largely practical. Generally, only law firms with experience in the area, as well as the financial resources for what can be an incredibly expensive discovery process, are willing to take medical malpractice cases. When claimed injuries are minor, even if there is a good chance at showing negligence and causation, medical malpractice claims may never be submitted to a court because it is not economically feasible for firms to pursue them.

The medical industry's claim that it needs to be protected from "frivolous lawsuits" is perhaps better understood in the sense that any person or entity dislikes going to court when the results could be a huge judgment against it. We understand that medical malpractice lawsuits are, at times, a nuisance to the medical industry, but, serious injuries and deaths are most certainly a "nuisance" to plaintiffs and their families.

Minn.Stat. § 145.682 is firmly in place, but it remains for the judicial system to interpret how strictly it stands as a bar to

medical malpractice claims, at times shutting lawsuits out even before the claims get to the summary judgment stage.

Respondents in this case (and medical professional defendants in other cases), claim that substantial prejudice would result if Minn.Stat. § 145.682 isn't construed strictly against plaintiffs. In point of fact, because of the detailed and exhaustive civil discovery process in Minnesota allotted to all plaintiffs and defendants, no prejudice whatsoever results to defendants in medical malpractice claims by a reasonable reading of Minn.Stat. § 145.682.

There is no need to over-scrutinize the expert affidavit. When the affidavit is approved by the district court, nothing bad happens. It is almost a *nonissue.* If Dr. Soderberg's affidavit had been approved by the district court, *nothing would be changed* in this case. The defense would continue with the reams of interrogatories and supplemental interrogatories now allowed, would proceed with all avenues of discovery open to them under Minn. R. Civ. P. 26, and would have the benefit of Minn. R. Civ. P. 35, including Minn. R. Civ. P. 35.04, which requires complete disclosure by the plaintiff, allows for total cross-examination of a party's medical expert if that testimony goes in as a testimonial disposition, and allows for the deposition of treating or examining medical experts upon motion and a showing of good cause.

If Minn.Stat. § 145.682 had never been enacted, *nothing would be changed* in this case. The defense would have the right to demand the names of prospective witnesses, medical or otherwise, and benefit of other discovery permitted under the civil rules. The same round of discovery would commence by both sides that was in place before the enactment of the statute, and the discovery process would be identical to the discovery process now in place *after* the statute. By the time of trial, the contents of a section 145.682 affidavit may become almost irrelevant. Neither side in these cases takes the expert affidavit as the end all and be all and attempts to rest on them. In short, the normal processes of discovery into negligence, causation, and damages provide the tools and information for the defense attorney to approach a medical malpractice case.

There is no practical reason, nor is any mentioned in the statute, which leads us to defy the Minn.Stat. § 145.682, subd. 4(a) affidavit and setting everything else aside, fly speck it against the plaintiff as if medical malpractice claims were "lifted" out of the decades-old rules of Minnesota civil procedure and transported back to the days of Napoleonic code pleading. In Justice Gilbert's opinion in *Anderson,* 608 N.W.2d 843, he conveyed concern that the majority seemed to be "reverting back to code pleading, * * * requiring plaintiffs to initially allege all detailed facts sufficient to prove the cause of action." *Id.* at 852 (Gilbert, J., concurring in part and dissenting in part). He stated that section 145.682 was "never meant to require plaintiffs * * * to literally try their cases in pre-trial affidavits." *Id.* at 853.

Dr. Soderberg's detailed and exhaustive affidavit easily puts the defendants on notice of his medical opinion covering the areas of negligence, causation, and the standard of care. Section 145.682 is a discovery tool, not a fetish. The affidavit is not a trial on the merits. It will not be introduced at trial as a separate exhibit resting on its own merits (assuming no other foundation than that "it was drawn"), and in reality is nothing more than a sneak preview to what defense counsel will inevitably uncover during the normal exhaustive discovery process. I suspect the medical industry would be alarmed if the identification of expert statute, at issue here, was held in such high regard that if the affidavit was accepted by the trial court, then a directed verdict would automatically be filed in favor of the plaintiff on the issues of negligence and causation, leaving only the issue of damages for the jury. I suspect defense counsel would immediately appeal, arguing that

the statute was only meant to identify the plaintiff's expert(s) and theory of the case and was never meant to be a substitute for the normal civil discovery process and a trial on the merits. That is exactly our point.

As stated above, after examining the complete affidavit of Dr. Soderberg, we easily conclude that it is adequate under the statute, and informs respondents of what they are entitled to know about the plaintiffs' case to prepare themselves for the discovery process and trial. The district court erred in finding that appellants' expert affidavit failed to meet the requirements of Minn.Stat. § 145.682, subd. 4(a).

## II. Standard for proof of sufficiency

■■■ The district court compounded its error by relying on the autopsy report and the rebuttal affidavit of respondents' expert to weigh and analyze the adequacy of appellants' expert affidavit. In concluding that appellants' expert affidavit did not satisfy the statute, the district court stated:

> The expert affidavit ignores the placental pathology report and the autopsy report that indicate that the fetus had a true knot in the umbilical cord. The expert affidavit does not provide any explanation as to how involving a physician immediately would have prevented the true knot in the umbilical cord and thus prevented the death of this fetus.

Respondents argue that the expert's affidavit must establish not only that negligence caused death, but also show (1) the sequence of biological facts that led to death and (b) the consistency of the expert's theory of causation with all biological facts. We find no authority for such an extension of the already significant statutory affidavit requirement.

■■■ The trial court adopted respondents' argument, concluding that Dr. Soderberg's affidavit was inadequate because it did not refute respondents' theory that the knot in the cord made death "unpreventable." We note that Minn.Stat.

§ 145.682, subd. 4(a), does not require an expert affidavit to *anticipate and refute adverse opinions* and somehow address them.

Respondents argue that Dr. Soderberg's affidavit does not adequately identify the actors. We easily conclude that it does. They are identified, and the description of many of the breaches of care implies conduct of both actors. Further discovery, a certainty to follow, will help develop the issues of whether one act was more significant than others, and which actor was responsible for the act.

The autopsy and placental pathology reports, prepared by respondent hospital, both stated that the umbilical cord had a true knot. Dr. Lupo's counter-affidavit concluded that a cesarean section (that Dr. Soderberg said was required under the applicable standard of care) would not have saved the fetus's life because of the presence of the true knot. The district court's order does not refer specifically to Dr. Lupo's report, but it is clear that it is the basis for the court's conclusion that involving a physician immediately would not have prevented the true knot. Dr. Soderberg's affidavit referred to the fetal autopsy and placental examination, noting that the umbilical cord had a true knot. Despite this knowledge, it was Dr. Soderberg's opinion that the fetus could have been born alive if the proper standard of care had been followed.

*There is nothing* in Minn.Stat. § 145.682 that suggests district courts are to use defendant's rebuttal affidavits and outside medical reports to judge the sufficiency of a plaintiff's expert affidavit. *See Lindberg*, 599 N.W.2d at 578 (holding that exceptions should not be read into medical malpractice statute because "it is not for the courts to read into a clear statutory scheme something that plainly is not there").

The Minnesota Supreme Court has provided guidance on the issue of how a dis-

trict court should balance conflicting opinions contained in expert affidavits offered by the parties. In *Tousignant v. St. Louis County*, 615 N.W.2d 53 (Minn.2000), the supreme court found that the plaintiff did not meet the requirements of Minn.Stat. § 145.682, but it concluded that plaintiff's cause of action was an extraordinary case not dependent on expert testimony. *Id.* at 58–60. The supreme court held that the plaintiff was still required to establish a prima facie case of medical malpractice, but when deciding whether a plaintiff had done so, the district court should rely on the plaintiff's expert and *not on rebuttal testimony from the defendant's expert. Id.* Establishment of a prima facie case is not the same as defending against summary judgment. *Id.* at 60. The language in *Tousignant* suggests that the district court's decision on the sufficiency of a plaintiff's expert affidavit is comparable to the decision on whether a plaintiff has established a prima facie case of medical malpractice. *See id.* at 59–60. Because conflicting evidence is not considered in determining whether a plaintiff has established a prima facie case, it was improper in this case to add that requirement.

We conclude that the district court erred in relying on a defendant's rebuttal expert affidavit in balancing and weighing (as if by a "mini-trial within a trial") Dr. Soderberg's expert affidavit to see if it met the statutory requirements of Minn.Stat. § 145.682, subd. 4(a).

The district court also improperly relied on the autopsy report in making its findings. The autopsy and placental pathology reports both "conclude" that the umbilical cord had a true knot. Concerning the true knot, the autopsy reports contained only conclusory statements (analogous to the "conclusory statements" that defense counsel have successfully argued are inadequate in an expert affidavit under section 145.682). *Stroud* held that a plaintiff cannot rely on a death certificate, in addition to an expert affidavit, to satisfy the statutory requirements because the death certificate does not provide an explanation of causation. 556 N.W.2d at 556. The autopsy and pathology reports in this case also contain no chain of causation between the true knot and the fetus's death. Further, Dr. Soderberg's affidavit contains his conclusion that the fetus would have been born if the proper standard of care had been followed. If a plaintiff cannot rely on conclusory statements in medical records to supplement an expert affidavit, the district court cannot rely on conclusory statements in an autopsy report to dismiss a plaintiff's expert affidavit for failure to answer and rebut every such statement in that autopsy report.

It should be noted that autopsy reports are required by law only in certain cases (*see* Minn.Stat. § 390.32, subd. 2(a)) and are recommended in others (Minn.Stat. § 390.32). None of these statutes have anything to do with the statute at issue here. Autopsy reports are: not documents which the law requires to be prepared anticipating contested litigation, not always a thorough medical explanation for what happened, are drawn ex parte, at times consist of only two or three lines in a voluminous hospital/medical report, and often, after further discovery, and/or trial testimony, cannot be relied upon exclusively as a cause of death. Neither plaintiffs nor defendants in medical malpractice suits give a two- or three-line autopsy report that degree of credibility. The district court simply erred by relying on the autopsy and placental pathology reports to act as rebuttal affidavits to Dr. Soderberg, and, to then conclude the affidavits were not sufficiently rebutted.

The district court's decision, which weighed appellants' expert affidavit, and respondents' expert affidavit, medical reports, and the autopsy report, resembled a summary judgment wherein respondents

moved for summary judgment, and despite conflicting expert affidavits and despite Minn. R. Civ. P. 56.03 and the supreme court's ruling in *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (in a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party), the district court granted judgment for respondents. A summary judgment hearing with testimony and opposing testimony is not called for under Minn.Stat. § 145.682 to determine the sufficiency of an expert's affidavit.

It is clear the district court granted dismissal pursuant to Minn.Stat. § 145.682, and did not rule on the motion for summary judgment. We note that had the trial court granted summary judgment, it still would have erred. The district court improperly disregarded plaintiffs' rebuttal affidavit, which was served in opposition to Dr. Lupo's affidavit. That affidavit directly contradicted the opinions of respondents' expert, as well as the conclusions in the autopsy and placental pathology reports. The district court ignored plaintiffs' supplementary affidavit because it was served after the 180 day time period applicable to Minn.Stat. § 145.682. If this had been summary judgment, Dr. Soderberg's rebuttal affidavit *was timely* and relevant. Genuine issues of substantial and material facts exist at this stage and, thus, summary judgment also would have been improper.

## DECISION

The district court erred in dismissing appellants' medical malpractice claim for failure to comply with Minn.Stat. § 145.682, subd. 4(a) (2000). The district court further erred by relying on respondents' rebuttal affidavit and on autopsy and placental pathology reports to weigh the adequacy of appellants' expert affidavit.

**Reversed and remanded.**

## APPENDIX

DISTRICT COURT
FOURTH JUDICIAL DISTRICT

STATE OF MINNESOTA
COUNTY OF HENNEPIN

Mary E. Demgen, individually

and as Trustee for the Next of Kin of

Baby Boy Martin Keller Demgen,

Decedent, and Martin A. Demgen,

Plaintiffs,

v.

Fairview Hospital and Healthcare

Services, a Minnesota non-profit

Corporation d/b/a Fairview–Riverside

Medical Center and a/k/a Fairview–

University Medical Center–Riverside

Campus, Michael Pleasants, M.D.,

Preston Williams, M.D., Margaret

Mesaros, and John Doe and Mary Roe,

Defendants.

State of Minnesota
S.S.

County of Hennepin

Case Type: Wrongful Death

Court File No. WD 98–011849

Affidavit of

Douglas Soderberg, M.D.

I, Douglas M. Soderberg, M.D., being first duly sworn upon oath state as follows:

1. I am a board certified in Obstetrics and Gynecology, licensed to practice medicine in the State of Minnesota. Attached hereto as Exhibit A is my curriculum vitae. I am familiar with the medical community and the standard of care in Minneapolis, Minnesota with regard to the practice of

Obstetrics. I have been practicing in Obstetrics in this community since July, 1981. I have practical knowledge of what is done in situations described by the medical records of Mary E. Demgen.

2. This Affidavit is made pursuant to Minn.Stat. § 145.682.

3. I have reviewed the medical records of Mary E. Demgen from May 24, 1995 through August 26, 1996, with respect to her intrauterine fetal demise with the Plaintiff's attorneys. Included among those records is a fetal heart monitoring strip dated August 7, 1996, which begins at 19:38 and continues to 20:31 (attached hereto as Exhibit B), an "Antepartum Outpatient Evaluation" dated August 7, 1996, which containing the initials "MM" and which indicates it was prepared by Nurse Margaret Mesaros. It includes notations from 19:38 through 22:15 on August 7, 1996, and is attached as Exhibit C.

4. Based upon my review of the above-referenced medical records, the salient facts are summarized as follows:

a. The patient, Mary Demgen, is a 33 year old gravida 3, para 1011 female who presented to her family practitioner for a first obstetrical visit on February 20, 1996. This was a routine visit. The only high risk perinatal factors identified were that of smoking ½ pack of cigarettes/day and a mildly abnormal Pap smear.

b. On April 29, 1996, Mrs. Demgen underwent a Level I ultrasound which revealed oligohydramnios, an ominous finding.

c. On May 6, 1996, a follow-up Level II ultrasound was found to be normal. The previous low amniotic fluid level was felt to be secondary to anterior-posterior uterine compression and the amniotic fluid level was reported as low normal.

d. On August 7, 1996, when she was 35 % weeks gestation, Mrs. Demgen called her physician, Dr. Michael Pleas-

ants, to report decreased fetal movement. She was asked to perform a fetal kick count and then admitted to Fairview Riverside Medical Center when she continued to note decreased fetal movement.

e. A fetal heart rate tracing begun at 19:38 in the hospital Labor and Delivery suite was, from inception, very abnormal with markedly decreased beat-to-beat variability and no reassuring fetal heart rate accelerations. The strip continues until 20:31, at which time the fetus dies. The medical records indicate that at no time did the nurse comment on the poor heart tracing, nor did she notify anyone else or attempt to assess the status of the fetus in any other way. While Exhibit B includes the notation at 19:50 "Dr. Pleasants called", there is no information regarding the context of this communication and no indication that this communication resulted in any attempt to use alternative means to assess the status of the fetus.

f. A subsequent bedside ultrasound examination showed no fetal cardiac activity and a diagnosis of intrauterine fetal demise was made.

g. After a long induction, Mrs. Demgen delivered a 1930 gram stillborn male on August 15, 1996. Oligohydramnios is diagnosed at the time of delivery.

h. Fetal autopsy and placental examination performed on August 16, 1996 reveal a true knot in the umbilical cord but no other remarkable findings.

i. Some of the medical records comment that Mrs. Demgen's fetus expired 10 minutes after her arrival at the Labor and Delivery Service. I cannot reconcile this comment with the time frame established in Exhibits B and C.

5. Based upon the facts as stated in Paragraph 4, I conclude, with reasonable medical certainty, as follows:

a. There was a deviation from the standard of care in evaluating the status of Mrs. Demgen's fetus upon her admission to Fairview Riverside Medical Cen-

ter Labor and Delivery on August 7, 1996. It is highly unusual for a fetus to die while undergoing fetal heart rate tracing in Labor and Delivery. When the non-reassuring fetal heart rate tracing is indicated at inception of admission, further evaluation should have been performed. The applicable standard of care requires that a doctor be immediately called in to do further testing to assess the status of the fetus. Failing to immediately involve a doctor based on the heart rate tracing present in this case deviated from the standard of care. The fact that the medical records show absolutely no comments on the poor heart tracing or any attempt to assess the status of the fetus in any other manner during the entire period of heart rate tracing indicates a deviation from the applicable standard of care. Nowhere in the medical records is there any evidence that the Labor and Delivery nurse was at all concerned by the very abnormal heart rate tracing, even though the patient had been admitted because of decrease[d] fetal movement. Examination of Exhibit C indicates that the Labor and Delivery nurse was aware that this was the reason for admission.

b. The applicable standard of care under the circumstances of this case would dictate that a fetal acoustical stimulation test or another type of fetal stimulation test or an immediate bedside ultrasound should have been performed.

c. Had the ultrasound test been performed, it would have revealed abnormally low amniotic fluid levels (i.e., the presence of Oligohydramnios). In combination with the markedly abnormal fetal heart rate tracing, this finding would dictate the need for an immediate caesarean section.

d. In a hospital comparable to that at issue, the applicable standard of care would dictate that such an emergency caesarean section be accomplished within 53 minutes, prior to this fetus dying.

The failure to have the appropriate tests completed delayed having a caesarean section performed. Failing to have the appropriate tests completed was a direct cause of the fetus' death. The deviations from the standard of care specified above caused the demise of Mrs. Demgen's fetus.

e. Had such an emergency caesarean section been timely performed, a live birth would have resulted. The applicable standard of care would dictate that the procedures specified above, including delivery by caesarean section, should have been completed prior to the cessation of the fetus's cardiac activity, as indicated on the monitoring strip.

FURTHER THIS AFFIANT SAITH NOT.