Jean **TEFFETELLER**; as trustee for the heirs of Thad Roddy, Appellant,

v.

**UNIVERSITY OF MINNESOTA, d/b/a University of Minnesota Hospital and Clinics, Pediatric Research And Education Foundation, Respondents.**

No. C8–00–1935.

Court of Appeals of Minnesota.

May 15, 2001.

202

Roger J. Aronson, Rischmiller, Knippel & Aronson, Minneapolis, MN (for appellant).

David C. Hutchinson, Jean Bernadette Hoppe, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, MN (for respondent University of Minnesota).

David D. Alsop, Elliot Lawrence Olsen, Gislason & Hunter, LLP, Minnetonka, MN (for respondent Pediatric Research and Education Foundation).

Considered and decided by TOUSSAINT, Chief Judge, G. BARRY ANDERSON, and PORITSKY, Judges.*

## OPINION

TOUSSAINT, Chief Judge

In this medical negligence wrongful death action, the district court granted respondents' motion for dismissal, finding that appellant's expert was not qualified to testify and that the required affidavit of expert review was insufficient under Minn. Stat. § 145.682 (2000). Because appellant's expert has qualifications that permit the reasonable expectation that he could testify at trial; and his medical opinion covering the areas of the applicable standard of care, negligence, and causation establishes a chain of causation, we reverse and remand.

## FACTS

Thad Roddy, a fifteen-year-old male, was diagnosed with leukemia. On December 4, 1996, he was admitted to respondent University of Minnesota's bone marrow transplant unit. A bone marrow transplant was completed on December 12th.

Prior to, and following the transplant, Roddy was given a morphine drip to help assuage high levels of pain. The morphine dosage was increased on December 18th. In the evening, Roddy began experiencing a fever. Staff began to closely monitor Roddy and, at each check, noted that Roddy was responsive and that his vital signs were stable until 7:30 a.m. on December 19th.

On the morning of December 19th at 8:30 a.m., nurse Sima Perry noticed that Roddy had become unresponsive, his respiratory levels had decreased, and his pupils had become pinpoint and sluggish. The nurse contacted Dr. Cynthia Wetmore, an employee of respondent University of Minnesota, who visited Roddy, checked his status, and discussed the possibility of morphine toxicity as being the cause of Roddy's lack of responsiveness. Dr. Wetmore, however, believed that morphine toxicity was an unlikely cause of Roddy's condition because he had been on the morphine drip for the preceding nine hours without incident.

After speaking with Perry, Dr. Wetmore then attempted to contact Dr. Michael

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

Shannon, an employee of respondent Pediatric Research and Education Foundation (PRE). There is a factual dispute in the record as to whether Dr. Wetmore spoke with Dr. Shannon at this time regarding Roddy's condition. Dr. Wetmore indicates that they spoke; Dr. Shannon indicates that they did not speak. Nevertheless, it is established that Dr. Wetmore consulted with Dr. Kenneth Tegtmeyer, another employee of PRE, at this time. The two doctors discussed Roddy's condition and concluded that his condition could be the result of either an infection, a head bleed, or morphine toxicity. The doctors discussed the use of two drugs, Narcan versus Nubain, to remedy morphine toxicity, and also discussed discontinuance of the morphine drip. The conversation resulted in a decision to give a small dose of Nubain in order to determine whether there was a component of morphine toxicity present.

At 9:20 a.m., Roddy was given a small dose of Nubain and the morphine was discontinued. The staff continued to monitor Roddy's condition. Roddy initially responded to the care with increased respiratory rates and more reactive pupils. At approximately 9:30 a .m., Dr. Bruce Blazar, a PRE employee, and Dr. Weigel, a University fellow, were called into Roddy's room while on morning rounds. Neither Dr. Blazar nor Dr. Weigel had been consulted about Roddy's condition prior to this time.

Between 9:30 a.m. and 10:23 a.m., Roddy's status deteriorated again. At 10:00 a.m., Dr. Shannon and Dr. Tegtmeyer were asked to assist with Roddy. Narcan was ordered at approximately 10:23 a.m. During the administration of Narcan, Roddy went into respiratory arrest. Roddy lost consciousness, went into a coma, and never regained consciousness. He was placed on mechanical ventilation, but his overall condition declined and life support was terminated on January 3, 1997.

Roddy's autopsy report and death summary state that the exact cause of his arrest was not clear, but that the decreased respiratory state before his arrest was secondary to the administration of morphine. Respondents provided evidence that two-thirds of patients die from complications following a bone marrow transplant. The complications are numerous, including graft versus host disease, lung injury, failure of engraftment, and veno-occlusive disease. The death summary also reported that Roddy ultimately died of multi-organ failure caused by extensive lung damage that was possibly caused by infection, aspiration, drugs, and/or transfusions.

Following Roddy's death, appellant Jean Teffeteller, as trustee for the heirs of Thad Roddy, filed suit alleging that respondents were negligent in failing to recognize the signs of morphine toxicity, and that such negligence directly resulted in Roddy's death. Certain depositions were conducted, and appellant served upon respondents an expert affidavit stating that she expected Dr. William Perloff, a pediatrician, to testify regarding the applicable standards of care. The affidavit states, in summary, that (1) Narcan, not Nubain, is the drug given to reverse the effects of morphine toxicity; (2) the applicable standard of care required diagnosis of morphine toxicity and the administration of Narcan; and (3) the failure to administer Narcan to Roddy on December 19th between 8:30 a.m. and 9:25 a.m. was the proximate cause of Roddy's death.

The district court dismissed the suit pursuant to Minn.Stat. § 145.682 (2000), holding that appellant's expert (1) lacked the appropriate qualifications to render an opinion in this case; and (2) even if he had the appropriate qualifications, he failed to

sufficiently explain the causal link between the respondent's actions and Roddy's death. This appeal followed.

## ISSUES

I. Did the district court err in finding that appellant's expert was not qualified to render expert testimony about the standard of care used to treat a post-operative pediatric bone marrow transplant patient suffering from morphine toxicity?

II. Did the district court err in finding that appellant's expert's affidavit was insufficient as to the alleged negligence of respondents and causation of Thad Roddy's death?

## ANALYSIS

Absent an abuse of discretion, this court will not reverse a district court's dismissal of a suit pursuant to Minn.Stat. § 145.682 (2000). *Anderson v. Rengachary*, 608 N.W.2d 843, 846 (Minn.2000).

Under Minnesota law, a plaintiff who brings a medical malpractice claim must file an affidavit that identifies (1) qualified experts who intend to testify; (2) the substance of their testimony; and (3) a summary of the basis for the experts' opinions. Minn.Stat. § 145 .682, subd. 4(a). Failure to comply with the affidavit requirements mandates that the district court dismiss the plaintiff's cause of action with prejudice. *Id.,* subd. 6; *Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 577 (Minn. 1999).

■ In determining whether to dismiss a claim under Minn.Stat. § 145 .682 for the inadequacy of an expert affidavit, the district court must read the affidavit as a whole. *Demgen v. Fairview Hosp. & Healthcare Servs.,* 621 N.W.2d 259, 262–63 (Minn.App.2001), *review denied* (Minn. Apr. 27, 2001). Review of the affidavit is

not a trial on the merits, but merely a determination of whether the affidavit puts the defendants on notice of the proposed expert, his qualifications, and his medical opinions covering the areas of the applicable standard of care, negligence, and causation. *Id.* at 265.

## I.

Appellant argues that the district court erred in determining that Dr. Perloff did not have the requisite qualifications to render an opinion as to whether respondents had acted negligently in the treatment of Thad Roddy, and that Roddy died as a result of their negligence. In a medical malpractice action, an expert affidavit must be submitted by "an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial." Minn.Stat. § 145.682, subd. 3.

■ An expert's opinion is admissible at trial if the witness has both sufficient scientific knowledge and some practical experience with the subject matter of the proposed testimony. *Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn.1977); *see also* Minn. R. Evid. 702 (requiring evidence of expertise before a witness may be qualified as an expert).

■ The expert

must have had basic education and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the [treating doctors] charged with malpractice that is of controlling importance in determining competency.

*Cornfeldt,* 262 N.W.2d at 692–693 (citation and quotation omitted).

Here, appellant's expert proposes to testify that respondents failed to recognize and treat Roddy for morphine toxicity. We conclude that appellant carried the burden of proving that Dr. Perloff had scientific knowledge and some practical experience in treating morphine toxicity in a pediatric patient. *See Anderson,* 608 N.W.2d at 846 n. 3 (plaintiff carries the burden of proof to establishing the sufficiency of the expert testimony).

Appellant provided an affidavit and curriculum vitae of Dr. Perloff that established that he has scientific knowledge and extensive practical experience in treating morphine toxicity in a pediatric patient. Perloff is board certified in pediatric critical care medicine. He has worked for the University of Madison's hospital in the pediatrics division since 1986 and has acquired extensive experience in all aspects of the administration of morphine, its complications, the treatment of those complications, and the consequences of inappropriate treatment. Therefore, Dr. Perloff has extensive and appropriate knowledge of the standards of care related to morphine toxicity in pediatric patients.

Respondents, however, argue that at the time of Roddy's arrest, the oncology was not limited to pediatric care and within Dr. Perloff's experience; but was within the oncology of a pediatric bone marrow transplant and beyond Dr. Perloff's training and experience. In order to support this argument, respondents submitted evidence to the district court that bone marrow transplants are a specialized area of medicine, that complications following a transplant are numerous, and that training

or experience with this type of patient is, therefore, necessary to serve as an expert in this case.[1]

Dr. Perloff's testimony is limited to establishing the signs of morphine toxicity, the remedy, and the harm that can result from a failure to remedy morphine toxicity. Dr. Perloff has extensive educational and practical experience in each of these areas. Therefore, it is not beyond Dr. Perloff's medical experience to testify for the limited purpose of establishing the standard of care in recognizing and treating a pediatric patient for morphine toxicity. *Cf. Williams v. Wadsworth,* 503 N.W.2d 120, 124–25 (Minn.1993) (finding expert incompetent where expert purposed to testify about lymphangiogram procedures in a child, where his experience was limited to ordering about 20 lymphangiogram for adult patients years before expert acknowledged that testifying to the purpose of a lymphangiogram would be beyond his specialty). Impeachment evidence pointing out the deficiencies in Dr. Perloff's opinion, is better served at trial, where the fact-finder can fully consider, balance, and weigh the evidence developed from a full and complete discovery process. *See Demgen,* 621 N.W.2d at 265 (stating "there is no need to over-scrutinize the expert affidavit" because the discovery and trial process will flush out any inadequacies of expert's opinion). Therefore, we conclude that the district court erred in concluding that appellant's expert affidavit was insufficient to meet the requirements of Minn.Stat. § 145.682 because it was submitted by an expert whose qualifications did not provide a reasonable expecta-

---

1. Further, respondents cited *Bies v. Hennepin County Med. Ctr.,* No. C0–92–1591 (Minn.App. Mar.16, 1993), an unpublished opinion by this court which held that an expert was incompetent regarding the causal link between prematurity and cerebral palsy where the expert had experience only with premature patients, and not cerebral palsy patients. However, unpublished opinions are of persuasive value "at best" and not precedential. *Dynamic Air, Inc. v. Bloch,* 502 N.W.2d 796, 800 (Minn. App.1993).

tion that his testimony would be admissible at trial.

## II.

■ Appellant further argues that the district court erred when it concluded that even if Dr. Perloff was qualified, his affidavit failed to detail a chain of negligence between respondents' negligence and Roddy's death.

> The affidavit must contain more than just the facts found in the hospital or clinic record; conclusory statements are insufficient. Rather, the [plaintiff] must set forth, by affidavit or answers to interrogatories, specific details concerning the expert['s] expected testimony, including the applicable standard of care, the acts or omissions that [plaintiff] allege[s] violated the standard of care and an outline of the chain of causation that allegedly resulted in damage to [her].

*Demgen,* 621 N.W.2d at 262 (citations and quotations omitted).

Dr. Perloff provided two affidavits in order to explain the chain of causation in this matter. Respondent University of Minnesota argues that it is not subject to the supplemental affidavit. Because we conclude that the initial affidavit is sufficient to establish a standard of conduct, alleged negligence, and causation by all the defendants named and made party to this suit, our decision does not rely on those statements made by Dr. Perloff in the supplemental affidavit.

In the initial affidavit, Dr. Perloff's stated:

> It was below the accepted standards of care for the defendants to fail to timely recognize that Thad Roddy was experiencing Morphine toxicity on the morning of December 19, 1996. At 8:30 a.m., when the nurses noted that they were unable to rouse him with verbal, vigorous or tactile stimulation, or with sternal pressure, and Thad had pinpoint and sluggish pupils, the applicable standard of care would require recognition that Thad was in a state of Morphine toxicity.

> An acceptable level of care between 8:30 and 9:25 would have required frequent boluses or a continuous infusion of [Narcan], under continuous medical supervision, until there was evidence of ongoing reversal of narcotic toxicity, i.e., improvement in breathing, responsiveness to stimuli, and pupil size enlargement. It was below accepted standards of care for the defendants to administer Nubain * * * which may well have exacerbated the effects of the Morphine.

> Further, it is Dr. Perloff's opinion that had Thad Roddy's clinical status at [sic] been appreciated as Morphine toxicity at about 8:30 a.m., and had appropriate treatment measures been utilized, i.e. frequent boluses or a continuous infusion of [Narcan] continuously monitored by a physician, Thad Roddy, to a reasonable degree of medical probability would have been revived successfully. Finally, it is Dr. Perloff's opinion that the departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death.

The district court found that the affidavit specified acts and omissions of the respondents that fell below the standard of care, but that it failed to establish how those acts and omissions led to Roddy's death. Reading the affidavit as a whole, we conclude that the district court erred.

The affidavit: (1) identifies the parties charged with engaging in conduct that was below the standard of care in treating a pediatric patient for morphine toxicity; (2) establishes that it was below the standard of care to fail to administer Narcan when morphine toxicity is present; and (3) alleg-

es that the failure of defendants to administer Narcan between the 8:30 a.m. and 9:25 a.m. was below the standard of care and the proximate cause of Roddy's death.

These statements were sufficient to put the respondents on notice of appellant's proposed expert testimony and there is no prejudice to respondents in allowing the matter to proceed to trial where Dr. Perloff's opinion may be crystallized. *See Demgen*, 621 N.W.2d at 265–66 (finding expert affidavit sufficient where affidavit specified facts and circumstances that were allegedly negligent in such a manner as to give defendants a sneak preview of the expert's testimony); *cf. Lindberg*, 599 N.W.2d at 578 (finding expert affidavit insufficient where the affidavit failed to cite any facts in order to establish specifically what the defendants had done wrong). Therefore, the district court erred when it determined that the expert affidavit failed to sufficiently establish a chain of causation.

## DECISION

The district court erred: (1) in dismissing appellant's medical malpractice claim for failure to comply with Minn.Stat. § 145.682 (2000); (2) in holding that Dr. Perloff did not have sufficient qualifications to testify as an expert; and (3) in holding that the affidavit failed to establish a chain of causation sufficient to put respondents on notice of the expert's proposed testimony.

**Reversed and remanded.**