Jean TEFFETELLER, as trustee for the heirs of Thad Roddy, Respondent,

v.

UNIVERSITY OF MINNESOTA, dba University of Minnesota Hospital and Clinics, petitioner, Appellant,

Pediatric Research and Education Foundation, Petitioner, Appellant.

No. C8–00–1935.

Supreme Court of Minnesota.

June 13, 2002.

Geraghty, O'Loughlin & Kenney, P.A., David C. Hutchinson, Jean B. Hoppe, St. Paul, MN, for Appellant U of M Hosp. & Clinics.

Gislason & Hunter, LLP, David D. Alsop, Elliot L. Olsen, Minnetonka, MN, for Appellant Pediatric Research & Educ. Foundation.

Rischmiller, Knippel & Aronson, Roger J. Aronson, Minneapolis, MN, for Respondent.

## OPINION

STRINGER, Justice.

Respondent Jean Teffeteller, as trustee for the heirs of Thad Roddy, commenced this medical malpractice action against appellant University of Minnesota, doing business as University of Minnesota Hospital and Clinics, and appellant Pediatric Research and Education Foundation (PREF) alleging that both appellants negligently failed to recognize signs of morphine toxicity, and failed to appropriately treat morphine toxicity resulting in Roddy's death. The district court granted appellants' motions for dismissal ruling that respondent's expert was not qualified to testify as to the applicable standard of care and that, even if the expert had the appropriate qualifications, the expert affidavit submitted by respondent failed to meet the requirements of Minn.Stat. § 145.682 (2000).[1] The court of appeals reversed and remanded. We reverse the court of appeals and reinstate the ruling of the district court.

In November 1995, 14–year–old Thad Roddy was diagnosed with leukemia. He was admitted to the University of Minnesota Hospital on December 4, 1996 and underwent a bone marrow transplant on December 12, 1996. In the week following the transplant, Roddy received morphine to help manage his pain. The morphine dosage was increased on December 18, 1996 in an attempt to reduce his worsening throat pain.

At approximately 7:05 a.m. on December 19, 1996, members of the University of Minnesota nursing staff and Dr. Cynthia Wetmore, a medical resident employed by the University of Minnesota, checked on Roddy and found him to be alert, oriented, and responsive. Around 8:30 a.m., Sima Perry, a nurse employed by the University

---

1. The dissent notes that Minnesota Statutes § 145.682 was amended in 2002. Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws ——. The resulting changes do not affect our analysis however, because the amendment is only effective for causes of action commenced on or after May 23, 2002. *Id.* Further, while the statute now provides additional days to comply, it still mandates dismissal if the affidavit fails to disclose the required information. *Id.*

of Minnesota, checked on Roddy and found him to be unresponsive. Specifically, Nurse Perry wrote in her progress notes that she was unable to arouse Roddy with "verbal, vigorous tactile stimulation as well as sternal pressure." She also noted that Roddy's pupils were sluggish and that he had "dusky nailbeds." Nurse Perry notified Dr. Wetmore who immediately went to Roddy's bedside. Dr. Wetmore found that while Roddy was not completely unresponsive and did arouse some, he was not in his normal state of arousal. Dr. Wetmore also found that Roddy was respirating, that his blood pressure and heart rate were fine, and that his nailbeds were not in fact dusky.

At approximately 8:45 a.m., Dr. Wetmore called the intensive care unit and spoke with Dr. Kenneth Tegtmeyer, a fellow in pediatric intensive care employed by the University of Minnesota. Dr. Wetmore presented Roddy's condition to Dr. Tegtmeyer and the two discussed the possible reasons for Roddy's change in condition, including sepsis, a head bleed, and morphine toxicity. Dr. Wetmore believed that morphine toxicity was an unlikely cause of Roddy's change in condition because he had been doing fine for the preceding nine hours when he had been on a continuous morphine drip. Dr. Wetmore discussed the possibility of morphine toxicity with Dr. Tegtmeyer, recognizing that toxicity must always be considered when a patient is on morphine. In their discussion, Dr. Wetmore and Dr. Tegtmeyer agreed that they had four different options: (1) give a dose of Narcan (also known as naloxone), (2) give a dose of Nubain, (3) turn off the morphine drip completely, or (4) wait, watch, and do nothing. Dr. Wetmore and Dr. Tegtmeyer ultimately agreed that Dr. Wetmore would order a small test dose of 0.5 milligrams of Nubain be given to Roddy in an effort to assess whether a component of mor-

phine toxicity was present. Dr. Wetmore preferred to order Nubain rather than Narcan, because she believed that administering Nubain was a more conservative diagnostic test for determining whether morphine was playing a role in Roddy's condition, while Narcan would have immediately and abruptly reversed any morphine toxicity. Dr. Wetmore feared that any such immediate reversal of morphine toxicity caused by administering Narcan could lead to a number of undesirable side effects, including a sudden increase in intracranial pressure, a sudden rise in blood pressure, a sudden onset of extreme pain, or vomiting.

Dr. Wetmore testified at her deposition that she then called Dr. Michael Shannon, an attending physician in the pediatric intensive care unit employed by PREF, at approximately 9:00 a.m. She presented Roddy's condition to Dr. Shannon and explained the decision she and Dr. Tegtmeyer had reached about administering Nubain instead of Narcan. According to Dr. Wetmore, Dr. Shannon agreed with her assessment that, given the fact Roddy's vital signs were still stable, as well as the potential side effects of Narcan, ordering a small test dose of Nubain was reasonable and also a more compassionate and conservative approach than administering Narcan. Dr. Shannon testified in deposition that he did not recall any of this discussion with Dr. Wetmore and that he was not consulted about Roddy's care until shortly before he arrived at Roddy's room later that morning. He also testified that he was unfamiliar with the use of Nubain under the circumstances of this case. In any event, Roddy's morphine drip was stopped and 0.5 milligrams of Nubain were administered around 9:15 or 9:20 a.m.

Dr. Bruce Blazar, a pediatric pulmonary transplant staff physician employed by PREF, and Dr. Brenda Weigel, a pediatric

bone marrow transplant fellow employed by the University of Minnesota, were getting ready to begin their rounds when they were called into Roddy's room between 9:25 and 9:30 a.m. Dr. Blazar testified in deposition that either he or Dr. Weigel ordered the first dose of Narcan to be administered shortly after assessing Roddy's condition. A total of two or three doses of Narcan were administered between 9:30 and 10:23 a.m.

Dr. Shannon testified that he arrived with Dr. Tegtmeyer at Roddy's room sometime between 10:00 and 10:15 a.m. to assist in Roddy's care. According to the nurses' progress notes, Roddy began deteriorating shortly after Dr. Shannon arrived, during the administration of a dose of Narcan. At approximately 10:23 a.m., Roddy experienced a respiratory arrest and a code was called. Roddy was immediately intubated and two or three more doses of Narcan were administered between 10:25 and 11:30 a.m. Roddy never regained consciousness. He was placed on mechanical ventilation but died on January 3, 1997 after being removed from life support. Roddy's autopsy report indicated that he died as a result of multi-organ system failure, but that his decreased respiratory state before his arrest on December 19, 1996 was caused by the administration of morphine.

Respondent commenced this lawsuit on or about December 1, 1998. With the summons and complaint, respondent served an affidavit of respondent's attorney as required by Minn.Stat. § 145.682, subds. 2, 3 (2000), stating that the facts in the case had been reviewed by respondent's attorney with a medical expert whose qualifications provided a reasonable expectation that the expert's opinion could be admissible at trial and, in the opinion of the expert, the appellants' deviations from the applicable standard of care caused injury to respondent. There is no contention that this affidavit failed to meet the statutory requirements of Minn.Stat. § 145.682, subd. 3.

In February 1999, respondent and both appellants entered into a stipulation that the 180–day deadline for meeting the expert affidavit requirements of Minn.Stat. § 145.682, subd. 4 (2000) was extended to 90 days following the completion of certain discovery depositions. The last of these depositions occurred on June 17, 1999. On or about August 25, 1999, respondent served appellants with an affidavit of the expected testimony of respondent's expert, Dr. William Perloff. Dr. Perloff's curriculum vitae indicated that (1) he has been board certified in pediatrics and pediatric critical care, (2) he has held numerous teaching positions related to pediatric care, (3) he served as the medical director of the pediatric intensive care unit at the University of Wisconsin Children's Hospital in Madison, Wisconsin from 1982 to 1998, (4) he has served on multiple pediatric and critical care committees, and (5) he has published articles and given presentations on various aspects of pediatric care. The affidavit stated, in part:

Dr. Perloff is expected to testify that the medical and nursing care provided by the defendants fell below acceptable levels of care practiced by reasonably prudent physicians and nurses, under the circumstances of this case. It is Dr. Perloff's opinion that it was below accepted standards of care for the defendants to fail to timely recognize that Thad Roddy was experiencing Morphine toxicity on the morning of December 19, 1996. At 8:30 a.m., when the nurses noted that they were unable to rouse him with verbal, vigorous or tactile stimulation, or with sternal pressure, and Thad had pinpoint and sluggish pupils, the applicable standard of care would

require recognition that Thad was in a state of Morphine toxicity. * * *

An acceptable level of care between 8:30 and 9:25 would have required frequent boluses or a continuous infusion of naloxone, under continuous medical supervision, until there was evidence of ongoing reversal of narcotic toxicity * * *. It was below accepted standards of care for the defendants to administer Nubain, as ordered by Cynthia Wetmore, M.D., which may well have exacerbated the effects of the Morphine.

Further, it is Dr. Perloff's opinion that had Thad Roddy's clinical status [been] appreciated as Morphine toxicity at about 8:30 a.m., and had appropriate treatment measures been utilized, i.e. frequent boluses or a continuous infusion of naloxone continuously monitored by a physician, Thad Roddy, to a reasonable degree of medical probability would have been revived successfully. Finally, it is Dr. Perloff's opinion that the departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death.

Over 7 months later, on or about April 5, 2000, respondent served appellants with an affidavit supplementing Dr. Perloff's opinions, this time pertaining to Dr. Shannon and Dr. Blazar. The supplemental affidavit stated, in part:

It is Dr. Perloff's opinion that Drs. Shannon and Blazar, in their involvement in Thad Roddy's care, departed from an acceptable level of care expected of specialists in the practice of pediatric care. Specifically, it was below the acceptable standard of care to approve the administration of Nubain in this case. * * * An acceptable level of care at about 8:30 a.m., would have required frequent boluses of or continuous infusion of Naloxone, under continuous medical supervision, until there was evidence

of ongoing reversal of the narcotic toxicity * * *. [A]t about 8:30 a.m. up until the time of the arrest, all of the physicians caring for or providing medical input to the care of Thad Roddy, should have recognized that Thad Roddy was experiencing Morphine toxicity. As such, the applicable standard of care would have required the administration of Naxolone as above described. In addition, had Thad Roddy's clinical status been appreciated as Morphine toxicity at about 8:30 a.m. and thereafter, and had appropriate treatment measures been utilized as above outlined, Thad Roddy's death would have, to a reasonable degree of medical probability, have [sic] been avoided.

Both appellants moved for dismissal in June of 2000, arguing that respondent's expert affidavit and supplemental affidavit were insufficient as to negligence and causation, thereby failing to meet the requirements of Minn.Stat. § 145.682. The University of Minnesota also argued that Dr. Perloff's supplemental affidavit was untimely and that he was not qualified to render an opinion about the standard of care for treating Roddy. The district court, applying a summary judgment standard, granted both appellants' motions to dismiss. The court held that appellants were entitled to dismissal with prejudice under Minn.Stat. § 145.682 because of respondent's "failure to identify an expert qualified to testify to the applicable standard of care," noting that Dr. Perloff lacked practical and clinical experience in treating bone marrow transplant patients. Relying in part on deposition testimony from Dr. Blazar, a physician experienced in bone marrow transplant procedures, the court concluded that this specific experience was necessary to state an opinion because following a high risk procedure of this nature a physician would have several

additional factors to consider when diagnosing complications. The court also held that even if Dr. Perloff were qualified to render an opinion in this case, both appellants were entitled to have the case dismissed with prejudice because Dr. Perloff failed to detail a chain of causation between appellants' alleged malpractice and Roddy's death. Finally, the court concluded that Dr. Perloff's affidavits were "wholly deficient" under Minn.Stat. § 145.682 as they related to appellant PREF.

The court of appeals reversed, holding that Dr. Perloff was qualified to testify about the standards of care related to morphine toxicity in pediatric patients and that Dr. Perloff's first affidavit satisfied the requirements of Minn.Stat. § 145.682 for both appellants. *Teffeteller v. Univ. of Minn.*, 626 N.W.2d 201, 208 (Minn.App. 2001). This appeal followed.

## I.

■ We will reverse a district court's dismissal of a claim pursuant to Minn.Stat. § 145.682 only if we find that the district court abused its discretion. *Anderson v. Rengachary*, 608 N.W.2d 843, 846 (Minn. 2000). At the same time, statutory construction is a question of law and subject to de novo review. *Stroud v. Hennepin County Med. Ctr.*, 556 N.W.2d 552, 555 (Minn.1996).

■ In a medical malpractice case where expert testimony is necessary to establish a prima facie case, the plaintiff must satisfy two requirements provided in Minn.Stat. § 145.682. *Anderson*, 608 N.W.2d at 846; Minn.Stat. § 145.682, subds. 2–4. First, the plaintiff must serve the defendant with the summons and complaint accompanied by an affidavit of the plaintiff's attorney stating:

[T]he facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff * * *.

Minn.Stat. § 145.682, subd. 3. Then, within 180 days after commencement of the suit, the plaintiff must serve upon the defendant a second affidavit setting forth:

[T]he identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

*Id.*, subd. 4. Failure to comply with these requirements results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is required to establish a prima facie case. *Id.*, subd. 6; *see also Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 578 (Minn.1999).

■ The district court found that respondent's affidavit did not satisfy the requirements of Minn.Stat. § 145.682 because it failed to identify an expert qualified to testify to the applicable standard of care. Accepting the evidence in a light most favorable to the nonmoving party, the district court ruled that although Dr. Perloff had extensive experience in general pediatrics, he was not qualified to testify as an expert on the medical issue before the court because there was nothing in his affidavit or accompanying curriculum vitae indicating he had treated cancer patients or patients who have undergone bone marrow transplants. As a result, the district court concluded that Dr. Perloff's opinion

was not based upon knowledge of the customary response for physicians treating bone marrow transplant patients when they have decreased respiratory levels.

■ The dissent claims that in reaching its conclusion the district court erroneously imported language from subdivision 3 of Minn.Stat. § 145.682 when discussing the expert affidavit required by subdivision 4. According to the dissent, section 145.682 does not require that the expert affidavit be submitted by " 'an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial,' " as the court of appeals ruled. *Teffeteller,* 626 N.W.2d at 205 (quoting Minn.Stat. § 145.682, subd. 3). We disagree. The affidavit requirement simply cannot be met by a witness not reasonably expected to provide an admissible expert opinion at trial.

■ The statutory structure of section 145.682, subd. 2 provides that where a malpractice claim requires "expert testimony * * * to establish a prima facie case" the expert affidavit in subdivision 4 is required. Expert testimony cannot be given by a witness who is not an expert—that is, someone who is not qualified or competent to give an expert opinion. *See Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn.1977) (indicating that in order for a medical witness to be competent to testify as an expert, the witness must have both sufficient scientific knowledge of and practical experience with the subject matter of the offered testimony); *Swanson v. Chatterton,* 281 Minn. 129, 140, 160 N.W.2d 662, 669 (Minn.1968) (noting that notwithstanding other impressive credentials, an expert witness in a malpractice case must make a

substantial showing of qualification in the particular area necessary to support the claims at issue in the suit). Both the district court and the court of appeals appropriately considered Dr. Perloff's qualifications according to the standards articulated in *Cornfeldt,* but the court of appeals concluded that the district court erred in holding that Dr. Perloff was not qualified. *Teffeteller,* 626 N.W.2d at 206. We disagree.

Our case law makes clear that we are to apply "a very deferential standard" to the district court when reviewing a determination as to expert qualification, reversing only if there has been a clear abuse of discretion. *Gross v. Victoria Station Farms, Inc.,* 578 N.W.2d 757, 761 (Minn. 1998); *see also Benson v. N. Gopher Enters., Inc.,* 455 N.W.2d 444, 445–46 (Minn. 1990). Although *Gross* arose in the context of a summary judgment motion, and *Benson* in the context of whether there was sufficient foundation for an expert opinion at trial, the distinction is immaterial because the discretion accorded the district court in determining whether a witness has the qualifications necessary to provide an expert affidavit pursuant to Minn.Stat. § 145.682 is the same. The district court did precisely that here based upon Dr. Perloff's affidavit with attachments and significant discovery. It did not abuse its discretion in concluding that a doctor who is not specialized in the field of pediatric oncology, or experienced with the highly sophisticated procedure of bone marrow transplants, is not competent to testify as to this claim of medical malpractice.[2] To hold otherwise ignores the very deferential standard we accord the trial court as well as the purpose served by the

2. We do not dispute that Dr. Perloff has a long and distinguished career in pediatric medicine, as the dissent clearly points out. But in determining whether he was qualified as an expert in the field of pediatric oncology and with respect to bone marrow transplants, we cannot say that the trial court abused its discretion.

expert affidavit statute. Accordingly, we reverse the decision of the court of appeals on this issue.

## II.

We next consider the district court's finding that even if Dr. Perloff had the appropriate qualifications, his affidavit failed to meet the substantive requirements of section 145.682. Our medical malpractice jurisprudence has clearly defined a number of essential elements that must be included in the affidavit to avoid dismissal. Since 1990, we have reviewed four cases involving claims where expert testimony was necessary to establish a prima facie case. *See Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188 (Minn. 1990); *Stroud*, 556 N.W.2d 552; *Lindberg*, 599 N.W.2d 572; *Anderson*, 608 N.W.2d 843. In *Sorenson*, we first established what plaintiffs would be expected to set forth in the expert affidavit in order to comply with the requirements of subdivision 4. 457 N.W.2d at 190. The expert affidavit must (1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages. *Id.* In *Sorenson*, we concluded that the expert affidavit contained "empty conclusions" as to causation which could mask a frivolous claim in the absence of a showing as to how the defendant's alleged failure to properly diagnose the illness of the decedent's mother led to decedent's death. *Id.* at 192–93. Specifically, we held that the expert affidavit stating that the defendants "failed to properly evaluate" or "failed to properly diagnose" the patient did not set out how the expert will use the facts in the hospital record to

arrive at opinions of malpractice and causation. *Id.* at 192–93.

Later, in *Stroud*, we ruled that it is not enough for the expert affidavit to simply repeat the facts in the hospital record; rather, " '[t]he affidavit should set out how the expert will use those facts to arrive at opinions of malpractice and causation.' " 556 N.W.2d at 555 (quoting *Sorenson*, 457 N.W.2d at 192). In *Stroud*, a case alleging malpractice based on the defendants' failure to timely diagnose and treat a subarachnoid hemorrhage, we concluded that the expert affidavit provided only broad and conclusory statements as to causation. 556 N.W.2d at 556. The expert affidavit failed to connect the decedent's cause of death to the defendant's alleged delay in properly diagnosing and treating the decedent. *Id.*

Then in *Lindberg*, a case alleging malpractice based on the defendant's failure to advise the pregnant plaintiff to seek medical treatment, the expert affidavit failed to state what the standard of care was and how the defendants departed from it. 599 N.W.2d at 577–78. It stated that the plaintiff's baby died as a result of the negligent and careless conduct of the defendants. *Id.* at at 575. We concluded that the expert affidavit, as in *Stroud*, contained no more than a broad and conclusory statement as to causation. *Lindberg*, 599 N.W.2d at 578.

Finally, in *Anderson*, a case in which the plaintiff alleged that the defendant's negligence caused a severed vagus nerve and swelling of her esophagus and thyroid, we concluded that the expert affidavit failed to state what the standard of care was and how the defendant allegedly violated it; the affidavit even suggested that the cause of the plaintiff's injury was perhaps unrelated to defendant's acts. 608 N.W.2d at 848. Therefore, as to causation, we held that the affidavit failed to adequately de-

scribe the alleged negligence on the part of the defendant and its relationship to the plaintiff's injury. *Id.*

■ Applying the standards set forth in *Sorenson, Stroud, Lindberg,* and *Anderson,* and comparing the language of the affidavits in these cases to the first affidavit submitted by respondent's expert, we conclude that the district court did not abuse its discretion in holding that the affidavit failed to detail a chain of causation between the University of Minnesota's alleged negligence and Roddy's death.[3] Although Dr. Perloff's affidavit states that defendants should have immediately recognized that Roddy was experiencing morphine toxicity and outlines what should have been done to comply with an acceptable level of care thereafter, the affidavit treats the cause of death summarily:

[T]he departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death.[4]

This statement is remarkably similar to the statement of causation found in the affidavit deemed insufficient in *Stroud:*

[A]s a result of the breach of the standard of care [previously identified], there was a failure to diagnose and treat a subarachnoid hemorrhage which ultimately resulted in * * * death of the Plaintiff.

556 N.W.2d at 554. As in *Stroud,* the expert affidavit submitted by respondent here contains only broad, conclusory statements regarding causation and fails to set forth the chain of causation connecting the failure to treat Roddy for morphine toxicity and his death, as required by the statute. *Id.* at 556; *Sorenson,* 457 N.W.2d at 192–93. We therefore reverse the court of appeals and hold that the affidavits failed to meet the requirements of Minn.Stat. § 145.682, subd. 4.[5]

■ We take this opportunity to correct the analysis in the opinion of the court of appeals. The court held that the statements contained in Dr. Perloff's affidavit "were sufficient to put the respondents on notice of appellant's proposed expert testimony." *Teffeteller,* 626 N.W.2d at 208 (citing *Demgen v. Fairview Hosp.,* 621 N.W.2d 259, 265–66 (Minn.App.), *rev. denied* (Minn. Apr. 17, 2001)). The court

**3.** The district court's holding that Dr. Perloff's first expert disclosure did not satisfy the requirements of Minn.Stat. § 145.682, subd. 4, was based on its conclusion that the affidavit failed to outline a detailed chain of causation, the third *Sorenson* requirement. Since this was the sole basis for the district court's holding, and because the district court also stated that the affidavit did "specify [the] acts and omissions of the defendants that fell below the standard of care," we need not consider whether Dr. Perloff's affidavit satisfied the first two *Sorenson* requirements. As to the supplemental affidavit, the district court agreed with the University of Minnesota that it was untimely. Nonetheless, because PREF allowed its consideration, the district court evaluated its content and concluded that it was also insufficient under section 145.682. We agree and, noting its substantial similarity to Dr. Perloff's initial affidavit and its lack of any additional statement relating to causa-

tion, we refer to our analysis of Dr. Perloff's initial affidavit above and Part III *infra.*

**4.** The dissent cites this statement from Dr. Perloff's affidavit to vigorously challenge the district court conclusion that the affidavit fails to disclose causation. Causation is not established by such facile declarations however. *See Lindberg,* 599 N.W.2d at 578; *Stroud,* 556 N.W.2d at 556. The gist of expert opinion evidence as to causation is that it explains to the jury the "how" and the "why" the malpractice caused the injury. The dissent is no more illuminating as to this critical link than is Dr. Perloff's affidavit.

**5.** Because the court of appeals concluded that the initial affidavit was sufficient, it did not evaluate the sufficiency of Dr. Perloff's supplemental affidavit, nor did it express an opinion as to its timeliness. 626 N.W.2d at 207.

cited *Demgen* for the erroneous proposition that an expert affidavit is sufficient under Minn.Stat. § 145.682, subd. 4 if it specifies the facts and circumstances of the defendant's alleged negligence in such a manner as to give defendants a "sneak preview" of the expert's testimony. 626 N.W.2d at 208. The affidavit required in the statute must provide more than a sneak preview, as noted clearly and repeatedly in *Sorenson, Stroud, Lindberg,* and *Anderson.* "The statute requires far more information than simply identification of the expert intended to be called at trial or a 'general disclosure' * * *." *Lindberg,* 599 N.W.2d at 578. At a minimum, a "meaningful disclosure" is required setting forth the standard of care, the act or omissions violating that standard, and the chain of causation. *Anderson,* 608 N.W.2d at 849; *see also Lindberg,* 599 N.W.2d at 577; *Stroud,* 556 N.W.2d at 555–56; *Sorenson,* 457 N.W.2d at 193.

### III.

■ Finally, while we find Dr. Perloff's affidavits deficient as to both appellants on the issue of causation, we address as a separate matter the district court's conclusion that they were "wholly deficient" as to Dr. Shannon and Dr. Blazar, both employed by PREF. The district court concluded that it was a factual impossibility for either of Dr. Perloff's affidavits to satisfy the requirements of the statute as they relate to PREF. Its holding was based on the fact that both of Dr. Perloff's affidavits stated that the applicable standard of care would have required a continuous infusion of naloxone beginning at 8:30 a.m. and the evidence suggested that neither PREF doctors were involved with Roddy's care until about 9:30 a.m.

The record is unclear as to what time Dr. Shannon became involved in Roddy's care. Dr. Shannon contends that he was not involved until sometime between 10:00 and 10:15 a.m. Dr. Wetmore stated, however, that she spoke with Dr. Shannon at around 9:00 a.m. about his thoughts on whether or not to administer Nubain. Dr. Wetmore also claimed that she and Dr. Shannon discussed using Narcan instead of Nubain. Dr. Shannon does not recall this conversation. As for Dr. Blazar, the record indicates that he was not involved in Roddy's care until 9:25 to 9:30 a.m.

Dr. Perloff's first affidavit fails to identify what the standard of care for either Dr. Shannon or Dr. Blazar was, what they did to violate that standard, or even what their relation was to Roddy's care or to care provided by the treating physicians. The applicable standard of care identified in Dr. Perloff's first affidavit relates to recognizing the morphine toxicity at 8:30 a.m. and administering naloxone between 8:30 and 9:25 a.m. The acts allegedly falling below this standard were failing to timely recognize the morphine toxicity, administering Nubain, and failing to infuse naloxone between 8:30 and 9:25 a.m. There are no allegations that Dr. Shannon should have recognized the morphine toxicity based on the information presented to him during his telephone conversation with Dr. Wetmore, nor is there anything to indicate why either Dr. Shannon or Dr. Blazar should have been involved with Roddy's care between 8:30 and 9:25 a.m. Finally, even if Dr. Shannon did approve the administering of Nubain, respondent's theory is not that the administration of the Nubain caused Roddy's death. Therefore, the district court properly ·concluded that Dr. Perloff's first affidavit failed to articulate the statutory requirements as to PREF.

Dr. Perloff's second affidavit also fails to comply with the statutory requirements as to PREF. In it he again asserts that it was

below the acceptable standard of care to approve the administration of Nubain, but as noted above, no causal link is identified. The second affidavit also indicates that all of the physicians caring for or providing medical input to the care of Roddy should have administered naloxone starting at 8:30 a.m. until there was evidence of ongoing reversal of the narcotic toxicity. But Dr. Blazar was not present in Roddy's room until about 9:20 a.m. and Dr. Shannon did not arrive until 10:00 a.m. or shortly thereafter. There is nothing in Dr. Perloff's second affidavit indicating what these doctors could have done before they arrived in Roddy's room to satisfy the standard of care or that their care after arriving in Roddy's room caused his death. In fact, this second affidavit, like the first, seems to indicate that naloxone needed to be administered starting at 8:30 a.m. or shortly thereafter in order to have reversed the effects of morphine toxicity.

Thus, we conclude that both of Dr. Perloff's affidavits fail to provide any meaningful disclosure regarding what the standard of care required of PREF's doctors was or how they violated it. Furthermore, neither of Dr. Perloff's affidavits detail a chain of causation between any alleged acts or omissions of PREF's doctors and Roddy's death. Accordingly, we hold that dismissal with prejudice as to the claim against appellant PREF was not an abuse of the district court's discretion and that the court of appeals erred by concluding that the initial affidavit was sufficient to satisfy the statute as to appellant PREF.

Reversed.[6]

BLATZ, C.J., and PAGE, J. took no part in the consideration or decision of this case.

GILBERT, J., files an opinion concurring in part and dissenting in part, in which PAUL H. ANDERSON, J., joins.

GILBERT, Justice (concurring in part and dissenting in part).

I concur with the majority's conclusion in regard to the dismissal of appellant PREF, but respectfully dissent as to the remainder of the opinion. This case involves serious allegations of medical malpractice that caused the death of a 14–year–old boy. The undisputed cause of his decreased respiratory state leading to his respiratory arrest was morphine toxicity. It is undisputed that an accurate and timely medical diagnosis of Thad Roddy's deteriorating medical condition was required, along with the administration of appropriate medication in this hospital setting. However, whether the treating physician erroneously diagnosed and treated Roddy in a timely fashion when time was of the essence is disputed. Under these facts, there is a genuine issue of fact as to the applicable standard of care, the violation of that standard, and the chain of causation between the violation of that standard and Roddy's death.

As the majority opinion points out, Minn.Stat. § 145.682 was adopted to eliminate nuisance medical malpractice suits. *Stroud,* 556 N.W.2d at 555. However, the majority fails to label this case as a nuisance suit. The obvious reason for this failure is that the facts of this case do not warrant such a label. First, in regard to the initial affidavit that an attorney must serve with the summons and complaint, appellants do not dispute nor does the majority opinion take issue with the suffi-

---

**6.** In response to the dissent's reference to nuisance suits, we of course make no such ruling. Where the affidavits required under Minn.Stat. § 145.682 fail to meet the statuto-ry standards as interpreted in our case law, dismissal is mandated. *See* Minn.Stat. § 145.682, subd. 6.

ciency of that affidavit. The attorney affidavit requires a statement under oath that the facts of the case have been reviewed by the plaintiff's attorney with a medical expert whose qualifications provided a reasonable expectation that the expert's opinion could be admissible at trial and in the opinion of the expert the defendant's deviation from the applicable standard of care caused injury to the plaintiff. Minn. Stat. § 145.682, subd. 3. The respondent submitted an affidavit conforming to these requirements that was signed by an experienced attorney who has successfully practiced medical malpractice law for over two decades. The expert that this attorney consulted with has impeccable credentials and has served as the medical director of the pediatric intensive care unit of the University of Wisconsin Children's Hospital at Madison, Wisconsin from 1982 until at least 1998, when this litigation commenced. Additionally, he is board certified in pediatrics and pediatric critical care and has held numerous teaching positions and is a nationally renowned expert in both pediatric care and pediatric critical care. The facts of this case, coupled with the sworn affidavit of an attorney as an officer of the court, not only demonstrate that this case is not a nuisance case or frivolous in any sense, but in fact has substantial merit.

So why did the district court summarily dismiss this legitimate cause of action, with prejudice, on the merits before trial? The answer lies in a combination of errors in the district court's analysis and the standards used to adjudicate disputed facts in this pretrial context. The district court ruled that this eminently qualified physician was not only not qualified to render an opinion in this case, but even if he was, his sworn affidavit failed to meet the substantive requirements of section 145.682, subd. 4. Even though this involves a motion to dismiss, rather than a summary

judgment motion, the district court not only used the summary judgment standard in its analysis in "[v]iewing the evidence in the light most favorable to the [p]laintiff," but considered evidence beyond the pleadings and the expert affidavit and ignored our precedent in how to adjudicate issues of disputed facts in a summary judgment context.

In a summary judgment motion, a court may not weigh the evidence or make factual determinations, but is required to view the evidence in the light most favorable to the nonmoving party. *Fairview Hosp. and Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn.1995). Here, the district court not only weighed the evidence, but also made an ultimate factual determination that there were additional risks related to the treatment of bone marrow transplant patients that would be unfamiliar to Dr. Perloff, because he allegedly did not have "any practical or clinical experience in diagnosing or treating bone marrow transplant patients." However, there is absolutely no evidence in the record that indicates whether or not Dr. Perloff had such experience or that supports the district court's reasoning that morphine toxicity is treated any differently when dealing with a bone marrow transplant patient rather than any other type of patient. Appellants did not submit any sworn testimony of other independent medical experts that would support that contention. Even if they had, it would have been inappropriate for the court to consider such evidence because dismissal under section 145.682, subd. 6, is based on failure to comply with the disclosure requirements of the statute, not weighing the disclosures against other evidence. Furthermore, as to the ultimate issue of the sufficiency of the affidavit actually submitted, the court implicitly found that instant diagnosis and treatment

was not possible even though there is again no evidence in the record that would support that this conclusion or, alternatively, at a minimum there is disputed evidence on that issue because Dr. Blazar and Dr. Weigel seemed to instantly recognize it—albeit too late.

If there was any question as to Dr. Perloff's qualifications at this stage in the case, that should go to the weight of his testimony rather than the admissibility. *See Ruether v. State,* 455 N.W.2d 475, 477 (Minn.1990). In its reasoning, the district court imported language from subdivision 3 relating to the required attorney affidavit and confused the standards set out in subdivision 4 with those of subdivision 3. *Compare* Minn.Stat. § 145.682, subd. 3 *with* Minn.Stat. § 145.682, subd. 4. Not only did the district court confuse the language of these two subdivisions, its ultimate foundational determination as to Dr. Perloff cannot be justified even if the subdivision 3 language were used. Specifically, if the subdivision 3 language were imported into subdivision 4, then the subdivision 4 affidavit would have to be submitted by "an expert whose qualifications provide a reasonable expectation that the expert's opinions *could be admissible at trial.*" Minn.Stat. § 145.682, subd. 3 (emphasis added). This language clearly indicates that a final foundational determination for the expert's opinion should occur at trial. Otherwise, the phrase "could be admissible at trial" becomes meaningless. Dr. Perloff's qualifications surely provide a reasonable expectation that his opinion could be admissible at trial. It is troubling that the majority fails to recognize this and instead concludes that district court correctly concluded that section 145.682 requires a final foundational determination at this stage of the litigation. What is even more troubling is that the majority fails to recognize that the district court still

ordered dismissal after acknowledging that the statement in Dr. Perloff's first affidavit sufficiently specified two acts and omissions of the appellants that fell below the appropriate standard of care: timely recognition of morphine toxicity and administering Nubain instead of Narcan.

If Dr. Perloff's qualifications were viewed in the proper context of a motion to dismiss, Dr. Perloff is eminently qualified to render an opinion. Section 145.682 is silent as to the qualifications required of an expert signing the expert affidavit and appellants have not contested the attorney affidavit, which merely requires that an attorney review the case with "an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial." Minn.Stat. § 145.682, subd. 3. The expert does not even have to be identified at this stage, provide any details of the expert's opinion or even have to be called at trial.

Furthermore, subdivision 4 does not require the expert affidavit to include all of the information relevant to the expert's opinion such that the district court can make a final, definitive holding on whether the expert identified in the affidavit will be qualified to offer admissible testimony at trial. As we have recognized, "the most important disclosure of the affidavit required by [subdivision 4] is the *identity* of an expert who is willing to testify as to the alleged negligence." *Sorenson,* 457 N.W.2d at 191 (emphasis in original).

It is ironic that the majority affirms the district court even though the district court placed great reliance upon the testimony of two other treating physicians that appear to have similar if not identical qualifications as to those of Dr. Perloff. First of all, Dr. Kenneth Tegtmeyer is a fellow in pediatric intensive care employed by the

University of Minnesota and he was the first physician consulted by Dr. Wetmore when Roddy's condition deteriorated. There is nothing in the record indicating that Dr. Tegtmeyer had any more training than Dr. Perloff or that he had any more special expertise in bone marrow transplants than Dr. Perloff did. Similarly, Dr. Wetmore testified that she also called Dr. Michael Shannon, who was an attending physician in the pediatric intensive care unit. Again, Dr. Shannon appears to have similar, if not identical qualifications, to those of Dr. Perloff. Instead of speaking with Dr. Shannon, Dr. Wetmore ended up speaking with Dr. Tegtmeyer, asking for his advice because she believed him to be "a very experienced, knowledgeable fellow whom [she] respected." The district court elevated the expertise of Dr. Shannon and Dr. Tegtmeyer because they "performed daily rounds on the bone marrow transplant unit." However, there is nothing in the record that supports the district court's conclusion that either the "daily rounds" in the bone marrow transplant unit would provide any specialized knowledge of how to treat morphine toxicity or that morphine toxicity in this context would be treated any differently than in any other context. Dr. Perloff was at least as qualified to render an opinion on the diagnosis and treatment of morphine toxicity in this situation as Dr. Shannon and Dr. Tegtmeyer.

It also does not appear to be disputed that the proper medication that should have been administered was Narcan, rather than Nubain. Dr. Perloff rendered an opinion in that regard that was identical to the opinion of Dr. Blazar and Dr. Weigel, who in fact were the two treating physicians specializing in pediatric critical care and ordered the first dose of Narcan immediately after assessing Roddy's condition.

The majority opinion glosses over these numerous errors in reversing the court of appeals and affirming the district court's dismissal. While expanding the district court's considerable discretion to determine whether an expert has the necessary qualifications, which is normally resolved in the context of a trial, the majority ignores the obvious mistakes the district court made in using language from subdivision 3 to justify dismissal based on the expert affidavit required under subdivision 4 and in using summary judgment reasoning to come to an inapposite conclusion. At the same time, the majority takes time to criticize the language from the court of appeals on notice and sneak preview of the expert's testimony and instead creates more stringent requirements than this "unambiguous" statute, *Lindberg*, 599 N.W.2d at 577, was ever designed to implement.

We have never held that the statute's purpose is to replace or alter our rules of evidence or to require plaintiffs to provide foundation for district courts to finally determine that the expert submitting the expert affidavit will in fact be qualified to offer admissible expert testimony at trial pursuant to our rules of evidence. *See* Minn. R. Evid. 702–705. There is simply no support in the plain language of section 145.682 for the majority's contention that ultimate foundation determinations at this stage of the litigation are necessary for the elimination of nuisance medical malpractice claims. Rather, "[t]he procedural dismissal mandated by section 145.682, subdivision 6 seems * * * to have been designed to deal *only with cases completely unsupported by expert testimony*." *Sorenson*, 457 N.W.2d at 191 (emphasis added). Therefore, the focus should be on whether it is reasonable for the plaintiff to expect to call the expert witness identified in the expert affidavit at trial. Here, it was clearly reasonable for respondent to

expect to call Dr. Perloff as an expert witness as to causation.

The majority also concludes that Dr. Perloff's affidavit failed to meet the substantive requirements of section 145.682 as to the University of Minnesota. Contrary to the majority's conclusion, Dr. Perloff's first affidavit can be readily distinguished from those affidavits that we have held insufficiently outlined the chain of causation. This affidavit, unlike the "empty conclusions" of the expert affidavit in *Sorenson*, contained much more than mere assertions that the University of Minnesota doctors failed to properly evaluate, diagnose, or treat Roddy. It definitively states what these doctors failed to diagnose (morphine toxicity), what these doctors should have done (administer frequent boluses or a continuous infusion of naloxone), and why their failure to take these steps resulted in Roddy not reviving, which ultimately led to Roddy dying.

Similarly, unlike the expert affidavit in *Stroud*, which simply opined that the delay in diagnosis caused a complicated hospital stay, Dr. Perloff's first affidavit explicitly stated that Roddy's death was directly connected to the University of Minnesota doctors' departures from the acceptable level of care. Contrary to the majority's contention, this affidavit is not remarkably similar to the one we considered in *Stroud*. Unlike the affidavit in *Stroud*, which did not provide any explanation of how the defendant's conduct led to the decedent's death, Dr. Perloff's affidavit describes in detail how the University of Minnesota's failure to timely administer Narcan led to Roddy not reviving and ultimately dying.

Additionally, unlike the expert affidavit in *Lindberg*, Dr. Perloff's first affidavit stated the standard of care, indicated how the University of Minnesota doctors departed from it, and connected Roddy's death to the alleged departure. Dr. Per-

loff's affidavit definitively stated, "[T]he departures from accepted levels of care, as above identified, were a direct cause of Thad Roddy's death." The majority fails to recognize how these statements are very different than those in the affidavit considered in *Lindberg*, which stated that the decedent "died as a result of the negligent and careless conduct of the [d]efendants" without ever stating what the negligent or careless conduct was. *Lindberg*, 599 N.W.2d at 575.

Finally, unlike the expert affidavit in *Anderson*, which failed to adequately connect the alleged negligence to the plaintiff's injury, Dr. Perloff's first affidavit definitively stated that Roddy's death was a direct result of the University of Minnesota doctors' deviations from the acceptable standard of care. The majority's comparison to the affidavit considered in *Anderson* is again misplaced. In *Anderson*, the inadequacy of the affidavit as to causation was based on the fact that the phrase "undetermined etiology" suggested that the cause of the plaintiff's injury was unknown and perhaps unrelated to any negligence by the defendant. *Anderson*, 608 N.W.2d at 848. No such ambiguous phrase exists in this case; Dr. Perloff's affidavit stated, "[T]he departures from accepted levels of care * * * were a direct cause of Thad Roddy's death."

In sum, Dr. Perloff's affidavit identified both Roddy's medical condition that needed attention and specified the practical measures that should have been taken by the University of Minnesota doctors. It also connected the doctors' delay in properly diagnosing Roddy's condition to his death. Instead of recognizing this, the district court seemingly made an ultimate factual determination that instant diagnosis and treatment were not possible even though there is nothing in the record to support this conclusion. This was an abuse of discretion. As the majority opin-

ion points out, "The gist of expert opinion evidence as to causation is that it explains to the jury the 'how' and the 'why' the malpractice caused the injury." This explains why a jury, rather than a summary judgment court, should be deciding this issue.

Finally, the majority's assertion that it was not an abuse of discretion for the district court to dismiss respondent's claim with prejudice fails to include any discussion of remedies short of this. While we have indicated in the past that Minn.Stat. § 145.682, subd. 6 "cuts with a sharp but clean edge," *Lindberg,* 599 N.W.2d at 578, we have continued to recognize that in borderline cases when prejudice is absent, alternatives less drastic than procedural dismissal may be available.[1] *Anderson,* 608 N.W.2d at 848–49; *see also Sorenson,* 457 N.W.2d at 193 (first acknowledging the "borderline case" exception). Here, the district court dismissed a case with prejudice that was brought by an experienced medical malpractice attorney attempting to comply with the requirements of section 145.682 by submitting an affidavit of a highly qualified doctor specializing in pediatric critical care.

This was not a nuisance suit. Accordingly, dismissal with prejudice did not serve the recognized purpose for which the legislature enacted section 145.682. This conclusion should not change even if the majority were correct in holding that Dr. Perloff's affidavit did not comply with the subdivision 4 requirements. While subdivision 6 indicates that failure to comply with it results in mandatory dismissal with prejudice, the district court was free to consider alternative remedies. Respondents requested an opportunity to submit additional information on morphine toxicity when confronted with the question of that condition in relation to bone marrow transplants but the district court did not consider any supplemental information before ordering dismissal with prejudice. The majority fails to consider any appropriate alternatives to procedural dismissal with prejudice despite the fact that this was clearly not a nuisance claim.

For these reasons, I would affirm the court of appeals as to respondent's claim against the University of Minnesota.

PAUL H. ANDERSON, Justice
(concurring in part and dissenting in part).

1. The doctrine that the statute "cuts with a sharp but clean edge" has been recently sheathed by the legislature for all future actions. *See* Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws —— (amending Minn.Stat. § 145.682, subd. 6). Subdivision 6 now reads:

> Subd. 6. (a) Failure to comply with subdivision 2, clause (1), within 60 days after demand for the affidavit results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.
>
> (b) Failure to comply with subdivision 2, clause (2), results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.
>
> (c) Failure to comply with subdivision 4 because of deficiencies in the affidavit or answers to interrogatories results, upon motion, in mandatory dismissal with prejudice of each action as to which expert testimony is necessary to establish a prima facie case, provided that:
>
> (1) the motion to dismiss the action identifies the claimed deficiencies in the affidavit or answers to interrogatories;
>
> (2) the time for hearing the motion is at least 45 days from the date of service of the motion; and
>
> (3) before the hearing on the motion, the plaintiff does not serve upon the defendant an amended affidavit or answers to interrogatories that correct the claimed deficiencies.
>
> This section is effective the day following final enactment and applies to causes of action commenced on or after that date.

I join in the concurrence and dissent of Justice Gilbert.