**Amy Marie BROEHM, Appellant,**

v.

**MAYO CLINIC ROCHESTER, Respondent.**

No. C0–02–959.

Supreme Court of Minnesota.

Jan. 20, 2005.

Gerald J. Brown, Brown, Andrew & Signorelli, P.A., Duluth, MN, for Appellant.

Trudi Noel Trysla, Mayo Clinic Rochester, Rochester, MN, of counsel, Thomas Fraser, Ann E. Decker, Lora Esch Mitchell, Fredrikson & Byron, P.A., Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, Russell A., Justice.

Appellant brought a medical malpractice action in connection with injury incurred during post-operative care following tracheal resection surgery. The district court granted defendant's motion to dismiss on grounds that appellant had failed to comply with the expert witness disclosure requirements of Minn.Stat. § 145.682 (2004). The court of appeals affirmed, and we granted further review. Concluding that appellant's expert disclosure was sufficient to preclude mandatory dismissal of a nursing malpractice cause of action, we affirm in part, reverse in part, and remand to the district court for further proceedings.

On December 17, 1999, appellant Amy Marie Broehm underwent tracheal resection surgery, performed by Dr. Peter Pairolero, thoracic surgeon and chief of surgery at respondent Mayo Clinic Rochester, for a congenital narrowing of her trachea. The surgery involved removing a one and a half inch section of the trachea where the narrowing had occurred and reconnecting the two sections of the trachea with sutures. Following tracheal resection surgery, the patient's head and neck must be immobilized for two to three days as hyperextension of the neck could cause the separation of the tracheal sutures, resulting in suffocation. One method used by thoracic surgeons to immobilize the head and neck area is to suture the patient's chin to the chest. As an alternative, Dr. Pairolero designed a head restraint and has employed this method "dozens of times" for over 28 years.

The restraint consists of a surgical towel placed against the patient's forehead and secured by two strips of 2–inch–wide surgical tape attached to a headboard. Paul Holland, a physician assistant who worked with Dr. Pairolero and helped in developing the restraint, constructed the device used on Broehm. The usual practice was for Dr. Pairolero's "team" or "service" to manage the care of the device. On December 19, as Broehm began to recover from sedation, she complained of a headache and pain in her forehead. According to Broehm's medical chart, at noon the "primary s[ervice]" removed the restraint and observed an abraded area on Broehm's forehead. Triple antibiotic medication ointment was applied to the abraded area and the restraint was "redone to remove pressure from [the] site." A plastic surgeon was consulted who recommended additional ointments and gels for the wound, noting that it would heal without difficulty. The wound, however, did not heal properly and left a permanent scar on Broehm's forehead.

Broehm commenced an action against Mayo on July 31, 2001, alleging medical malpractice. As required under Minn. Stat. § 145.682, subds. 2, 3 (2004), Broehm served Mayo with an affidavit of expert review on the day that the suit was filed. Additionally, on January 21, 2002, within the 180–day period required under Minn. Stat. § 145.682, subd. 4 (2004), Broehm served Mayo with an expert witness disclosure signed by Linda Wick, R.N., C.N.P. On January 28, 2002, the last day of the 180–day time period, Broehm filed a motion to extend the 180–day deadline.

Mayo opposed the motion for extension and moved to dismiss Broehm's claim. The extension and dismissal motions came on for hearing on March 20, 2002. On April 9, 2002, without the district court's permission, Broehm submitted a "supplemental memorandum," seeking to preserve the position that expert disclosure was not required because Broehm would be entitled to a res ipsa loquitur jury instruction. In an attachment to the memorandum, Broehm submitted an expert disclosure identifying a plastic surgeon and summarizing his opinion. The district court, without considering the newly filed submissions, denied Broehm's motion for an extension and granted Mayo's motion to dismiss. The court found that Broehm had failed to demonstrate good cause for an extension and had failed to comply with the requirements of Minn.Stat. § 145.682.

On appeal, the court of appeals affirmed by panel majority. The court of appeals initially considered and rejected Broehm's claim that no expert testimony was required. The court then affirmed the procedural dismissal, concluding that Wick was not qualified to provide expert opinion as to the applicable standards of care as

required by Minn.Stat. § 145.682. The court affirmed the denial of an extension, concluding that Broehm had adequate time to comply with the expert-disclosure deadline and failed to show good cause for the requested extension. The dissenting panel member believed that while expert testimony would likely be necessary at trial, it was not required at the preliminary stage to show a prima facie case of medical malpractice.

## I.

In a medical malpractice action, Minn. Stat. § 145.682 requires that with service of the summons and complaint, plaintiff's attorney must also serve an affidavit stating that the case has been reviewed with an expert "whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." *Id.*, subds. 2, 3. Within 180 days of commencement of suit, plaintiff must serve upon defendant affidavits signed by each expert that plaintiff expects to call at trial stating, with respect to issues of malpractice or causation, the substance of the facts and opinions to which the expert expects to testify and a summary of the grounds for each opinion. *Id.*, subd. 4(a). Interrogatory answers may be used in lieu of affidavits so long as they are signed by the expert and plaintiff's attorney. *Id.* Noncompliance with the statutory requirements re-

sults in dismissal with prejudice. Minn. Stat. § 145.682, subd. 6 (2004).[1]

■ Here, in dismissing Broehm's complaint for failure to comply with expert disclosure, the district court determined that a nurse practitioner was not qualified to provide expert opinion as to the standard of care of a thoracic surgeon. We will reverse a district court's dismissal of a malpractice claim for noncompliance with expert disclosure only if the district court abused its discretion. *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 427 (Minn. 2002).

In an effort to reduce the costs associated with malpractice litigation as a means to increase the availability of reasonably priced medical insurance, nearly every state has enacted some measure of medical malpractice litigation reform. Mitchell J. Nathanson, *It's the Economy (and Combined Ratio) Stupid: Examining the Medical Malpractice Litigation Myth and the Factors Critical to Reform*, 108 Penn. St. L.Rev. 1077, 1077 n. 1 (2004). The Minnesota legislature enacted expert-review and expert-disclosure requirements as a means of readily identifying meritless lawsuits at an early stage of the litigation. *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190–91 (Minn.1990) (noting that "the legislature contemplated procedural reform directed at elimination of 'frivolous cases'" in adopting the statute). "[N]otice of claim and certificate of merit provisions are not as intrusive as more elaborate malpractice [screening] panels seen in other states * * *." Thomas J. Hurney, Jr.,

---

1. At the time Broehm commenced her action, section 145.682 provided that failure to timely serve the expert disclosure, upon motion, resulted in mandatory dismissal with prejudice of every cause of action as to which expert testimony was necessary to establish a prima facie case. Minn.Stat. § 145.682, subd. 6 (2000). The legislature has since amended that provision, requiring the defendant to specify in the dismissal motion the deficiencies in the affidavit or interrogatories and allowing a 45-day time period for the plaintiff to cure the deficiencies before dismissal with prejudice is mandatory. The amendment applies to causes of action commenced on or after May 23, 2002. Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws 1706–07 (codified at Minn.Stat. § 145.682, subd. 6(c) (2004)).

*Medical Professional Liability in West Virginia,* 105 W. Va. L.Rev. 369, 385 n. 115 (2003). Certificate of merit requirements have proven more effective than other malpractice reform mechanisms, such as arbitration panels and capping of damages, in "reducing insurers' litigation costs without significant social costs." Nathanson, *supra* at 1079.

So as not to undermine the legislative aim of expert review and disclosure, we have stressed that plaintiffs must adhere to strict compliance with the requirements of Minn.Stat. § 145.682. *See Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 577–78 (Minn.1999) (statutory requirements are "uncomplicated and unambiguous" and contemplate strict compliance). Plaintiffs are "expected to set forth, by affidavit or answers to interrogatories, specific details concerning their experts' expected testimony, including the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation that allegedly resulted in damage to them." *Sorenson,* 457 N.W.2d at 193. We have made plain that "broad and conclusory statements as to causation" and "empty conclusions" are insufficient. *Anderson v. Rengachary,* 608 N.W.2d 843, 847–48 (Minn.2000) (expert affidavit failed to set forth standard of care, did not identify acts or omissions that violated standard of care and made no attempt to outline chain of causation resulting in injury); *Lindberg,* 599 N.W.2d at 578 (expert affidavit failed to state how health care providers departed from standard of care, failed to recite facts upon which expert would rely as a basis for expert opinion and failed to outline a chain of causation); *Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552, 556 (Minn.1996) (expert affidavit provided only broad, conclusory statements as to causation and did not

provide outline of chain of causation between alleged violations of standard of care and claimed damages, merely opining that delay in diagnosis resulted in complicated hospital stay).

The expert disclosure requirements cannot be met by a witness who is not qualified to give an expert opinion. *Teffeteller,* 645 N.W.2d at 427 (expert not specialized in field of pediatric oncology or experienced with bone marrow transplants not qualified to submit expert affidavit as to customary response for physicians treating pediatric bone marrow transplant patients); *Wall v. Fairview Hosp. and Healthcare Servs.,* 584 N.W.2d 395, 405 (Minn.1998) (psychologist and psychotherapist not qualified to provide expert opinion about the appropriate standard of care for a psychiatric nurse); *cf. Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn.1977) (expert medical witnesses must have both sufficient scientific knowledge and practical experience with respect to subject matter of the offered testimony).

We have been firm in holding that failure by the plaintiff to strictly satisfy the requirements under Minn.Stat. § 145.682, subd. 4(a) results in dismissal of the claim with prejudice. *Teffeteller,* 645 N.W.2d at 430–31 (dismissal of malpractice action mandated where expert disclosure contained only broad and conclusory statements); *Anderson,* 608 N.W.2d at 848 (dismissal mandated where expert disclosure clearly failed to fulfill the statutory requirements); *Lindberg,* 599 N.W.2d at 578 (dismissal mandated where expert disclosure falls short of the substantive disclosure requirements).

Here, the district court found that Broehm's expert disclosure did not satisfy the requirements of Minn.Stat. § 145.682 because it failed to identify an expert qualified to testify to the applicable standards of care. The Wick disclosure

set forth four duties that Mayo allegedly owed Broehm and that Wick claimed were breached:

1. Obtain her informed consent to the use of a head restraint device that had a foreseeable risk of causing a permanent wound and scarring to her forehead if, such was a known or foreseeable risk.

2. Construct a head restraint device that did not cause a wound injury or, alternatively, employ an alternative technique to immobilize the head.

3. Inspect skin integrity and the restraint device as though it were a dressing at regular intervals, no less often than once each 8 hour nursing shift or more often if medically indicated.

4. Seek appropriate specialty care to diagnose and treat the patient's forehead wound immediately upon discovery of the wound.

Wick received her baccalaureate degree in nursing in 1984 and earned a master's degree in 1995. She is a certified geriatric nurse practitioner and is currently employed at St. Mary's Duluth Clinic, principally in the nephrology department. As the lower courts concluded, Wick has neither the training nor the practical experience necessary to offer opinions regarding postoperative care following tracheal resection surgery in support of claims based on the first two asserted duties; and the expert disclosure does not indicate that Wick has sufficient practical experience to qualify her as an expert in support of a claim based on the asserted duty to seek appropriate specialty care. The dismissal of those claims was not an abuse of discretion.

Wick does, however, appear to have sufficient training and practical experience with respect to general nursing care duties and duties of a nurse practitioner sufficient to qualify her as an expert in support of a claim based on a nursing standard of care. Thus, while the claims of failure to obtain informed consent, failure to construct an appropriate head restraint, and failure to seek appropriate specialty care upon discovery of the wound were properly dismissed by the district court, we reverse the dismissal of the remaining nursing malpractice claim and remand for further proceedings.

## II.

■■ Broehm also argues that the district court abused its discretion in denying her motion to extend the 180–day expert-disclosure deadline. We review the denial of an extension of the disclosure deadline for an abuse of discretion. *See, e.g., Lindberg,* 599 N.W.2d at 578–79. A plaintiff is allowed to extend the expert-disclosure deadline past the 180–day statutory time limit "by order of the court for good cause." Minn.Stat. § 145.682, subd. 4(b) (2004). Broehm sought an extension to obtain opinions from physicians with expertise in plastic surgery and dermatology.

Broehm had copies of her medical records well in advance of commencing the medical malpractice action. She had taken depositions of both Dr. Pairolero and physician assistant Holland a full two months prior to the deadline. As grounds for an extension, Broehm asserted that she had expected Mayo to offer an opinion concerning the cause of the injury to her forehead and that she needed additional information related to the head restraint. In denying the extension, the district court noted that Mayo had no obligation to provide opinions on causation beyond those provided in discovery and that all obtainable information concerning the restraint had long since been available. In affirming, the court of appeals observed that as of the time of the hearing on the extension-request motion, Broehm "had been in possession of the

relevant medical records for more than a year. The medical treatment that appellant alleges was negligently provided occurred two years before the date of the hearing." *Broehm v. Mayo Clinic Rochester,* No. C0–02–959, 2003 WL 951886, at *5 (Minn.App. Mar. 11, 2003). In that Broehm had sufficient information from which to obtain a qualified expert well before expiration of the 180–day deadline and otherwise failed to show good cause for an extension, the denial of an extension was not an abuse of discretion.

### III.

■ Finally, Broehm asserts that expert disclosure was unnecessary because the determination of Mayo's negligence was within the common knowledge of laypeople, citing *Tousignant v. St. Louis County,* 615 N.W.2d 53 (Minn.2000). *Tousignant* involved a claim that a nursing home breached a standard of care by failing to follow physician's orders to restrain a resident. *Id.* at 58. The claim did not involve medical care that required professional judgment. Rather, it involved nonmedical, administrative, custodial or routine nursing home care. *Id.* at 59–60. By contrast, as the court of appeals observed, Broehm's claim alleged medical malpractice "arising from negligent postoperative care." *Broehm,* 2003 WL 951886, at *3. The claim required a medical expert.

■ Broehm also asserts that the doctrine of res ipsa loquitur excuses her from expert-disclosure requirements. This issue was neither timely presented before the district court nor adequately briefed on appeal. Generally, we decline to review issues under these circumstances. *See, e.g., Dep't of Labor & Indus. v. Wintz*

*Parcel Drivers, Inc.,* 558 N.W.2d 480, 480 (Minn.1997) (issue not adequately briefed on appeal); *Thiele v. Stich,* 425 N.W.2d 580, 582–83 (Minn.1988) (issue not raised in district court).

Affirmed in part, reversed in part, and remanded for further proceedings.

ANDERSON, G. Barry, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

### SPECIAL CONCURRENCE

ANDERSON, Paul H., J. (concurring specially).

I agree with the majority's conclusion that this matter should be remanded to the district court for further proceedings, but I write separately because I believe that the majority fails to adequately address the district court's actions, explain our precedent, and unnecessarily limits Amy Marie Broehm's ability to present evidence on remand. Moreover, a full understanding of this case and our precedent requires a more complete development of the facts surrounding Broehm's injury and the procedural history. Accordingly, I begin my special concurrence with a more detailed discussion of the relevant facts.

Following surgery and placement of the head restraint, Broehm was kept in a heavily sedated paralytic condition. Dr. Peter Pairolero testified that it is his policy for his "team" or "service" to manage the head control device during this time period and that if anything needs to be done, "[the] service is supposed to do that."[1] Although Paul Holland, Dr. Pair-

---

1. It is not clear from the record if there is a formal name for the "team" or "service" to which Dr. Pairolero refers. In his deposition, Holland mentions a "critical care service" and an entry to Broehm's chart refers to a "primary" service. We have no other information about this service.

olero's physician assistant, could not recall any specific directions to the nursing staff, he stated that nursing personnel would have known from past experience that only Dr. Pairolero's service was allowed to adjust or disturb Broehm's head restraint.

On Sunday, December 19, approximately 48 hours after surgery, Broehm began to recover from the sedation. At that time, she complained of a headache and pain in her forehead. Apparently the nursing staff on duty did not act immediately upon Broehm's complaint. Broehm's mother, who was with her at the time, recalled that someone did eventually look beneath the restraint. Broehm's mother stated that, after this inspection, other hospital staff came to the room and the restraint was adjusted. But it is not clear from the available records whether the initial inspection of Broehm's skin was performed by a member of the nursing staff or by a member of Dr. Pairolero's service. According to Broehm's medical chart, at noon on December 19 the "primary s[ervice]" removed the restraint and discovered a "9x1cm reddish-purple area" across Broehm's forehead. Triple antibiotic ointment and "Elastogel" were then applied to the area and the restraint was "redone to remove pressure from [the] site."

In his deposition, Dr. Pairolero stated that he believed it was during his rounds on Monday, December 20, when he first became aware of Broehm's injury and inspected the restraint and wound. He later stated that he was disappointed at the development of the wound because such a wound was unexpected and had never occurred in the dozens of times he had previously used that kind of restraint. He contacted Mayo's plastic surgery department for further consultation and assistance in treating the wound. Dr. Phillip Arnold, a plastic surgeon, examined Broehm on Tuesday, December 21. Dr. Arnold ob-

served what "look[ed] like a partial thickness defect." Dr. Arnold prescribed additional ointments and gels to be applied to the wound and noted it "should heal without much difficulty."

Other than the injury to her forehead, Broehm's tracheal resection surgery was successful. Broehm reported being able to breathe better than she had ever remembered. However, as the majority notes, the skin on her forehead did not heal properly and a scar developed across her forehead above her brow line. The record shows that this scar is clearly visible in a March 2001 photograph of Broehm.

In September 2000, Broehm, acting through her attorney, requested a certified copy of her Mayo medical records. Broehm commenced this action in Saint Louis County District Court by mailing a summons and complaint to Mayo and Mayo acknowledged service of the complaint on July 31, 2001. Broehm's mailing to Mayo included an affidavit from her attorney stating that he had reviewed Broehm's claim with a qualified expert and, in the opinion of the expert, Mayo deviated from an applicable standard of care and such deviation resulted in Broehm's injury. This affidavit is required by Minn.Stat. § 145.682, subd. 3 (2004). On August 14, 2001, at Mayo's request, the case was transferred to Olmsted County District Court.

In an interrogatory answer submitted on January 21, 2002, Broehm disclosed to Mayo the identity and opinion of an expert witness—registered nurse Linda Wick. *See* Minn.Stat. § 145.682, subd. 4(a) (2004) (permitting disclosure in the form of interrogatory answers in lieu of an affidavit). As required by section 145.682, subd. 4(a), Broehm's disclosure of Wick as an expert witness was signed by both her attorney and Wick. Wick's signature acknowledged that she certified the contents of the dis-

closure and adopted the testimony it summarized. *See id.*

Wick first summarized her credentials. She has baccalaureate and master's degrees in nursing and is a certified geriatric nurse practitioner. She has worked as a nurse since 1984 and, at the time of the disclosure, she worked at St. Mary's Duluth Clinic, principally in the nephrology department.[2] Wick then summarized her opinion regarding Broehm's wound. Wick agreed with the "description and diagnosis" in Mayo's records that the probable cause of the wound "was a pressure necrosis." Pressure necrosis describes a condition where pressure sores occur in immobilized patients due to chronic pressure on tissues overlying bony prominences. Josef Feit, et al., Atlas of Dermatology, 2.3.9 Pressure Necrosis, *available at* http://atlases.muni.cz/atl—en/main+nenadory+scratch.html (October 2004). She noted that general hospital policy would require documentation of skin integrity at least once during each eight-hour nursing shift "whenever a dressing or equivalent foreign material has been applied to a patient's skin." She presumed this to also be the policy of Mayo.[3] Wick stated that Broehm's restraint "had the essential characteristics of a 'dressing,' so as to require adherence to the skin integrity and dressing inspection protocols." She further noted that if Dr. Pairolero ordered that the restraint not be disturbed, such an instruction from a physician would require him to personally inspect the dressing or assign someone else to "fulfill the duty of inspection." Wick also asserted that these orders should have been included in the medical records obtained from Mayo by Broehm, but were not. Finally, Wick stated that Mayo's hospital records did not indicate that any inspections by Dr. Pairolero or others took place before Broehm complained of pain.

In the disclosure, Wick observed that the "importance of frequent, periodic inspection of dressings, particularly where adhesive tape is stretched tightly against unprotected forehead skin, is well-known and universally accepted in basic nursing instruction and medical literature." She then described how necrosis of the skin can result from restriction of the blood supply. The development of skin necrosis may take from several hours to several days depending on a number of variables, including the amount of pressure and the direction of the pressure. Wick explained that pain usually precedes death of the skin tissue, but an anesthetized or heavily sedated patient who cannot sense pain is "uniquely vulnerable to the skin necrosis process." The necrosis process may also depend on the health of the patient. Wick stated that, because Broehm did not suffer from any health condition that would have contributed to the necrosis, "the amount of pressure on [Broehm's] skin sufficient to cause necrosis must have been significant and excessive."

Wick then asserted that Mayo's staff "minimized and underestimated the severity of the wound" after it was discovered. She noted that a skin specialist or plastic surgeon did not examine Broehm until Tuesday, December 21—two days after the wound was discovered. Wick claimed that more aggressive attention would have "produced less permanent scarring."

---

**2.** Nephrology is "[t]he science that deals with the kidneys, especially their functions or diseases." *American Heritage Dictionary of the English Language* (3rd ed.1992).

**3.** Mayo stated in an interrogatory answer that it "did not have a written policy for the inspection or examination of the head restraint device used on Ms. Broehm."

Wick next stated that Mayo owed Broehm duties to:

1. Obtain her informed consent to the use of a head restraint device that had a foreseeable risk of causing a permanent wound and scarring to her forehead if[ ] such was a known or foreseeable risk.

2. Construct a head restraint device that did not cause a wound injury or, alternatively, employ an alternative technique to immobilize the head.

3. Inspect skin integrity and the restraint device as though it were a dressing at regular intervals, no less often than once each 8 hour nursing shift or more often if medically indicated.

4. Seek appropriate specialty care to diagnose and treat the patient's forehead wound immediately upon discovery of the wound.

Wick then specified that these duties were breached when Mayo:

1. Fail[ed] to obtain [Broehm's] informed consent.

2. Fail[ed] to construct a head restraint device that did not cause a wound injury.

3. Fail[ed] to inspect skin integrity and the restraint device as though it were a dressing at regular intervals no less often than once each 8 hour nursing shift or more often if medically indicated.

4. Fail[ed] to seek appropriate specialty care to diagnose and treat the patient's forehead wound immediately upon discovery of the wound.

Wick was the only expert disclosed by Broehm before the January 28, 2002 expiration of Minn.Stat. § 145.682's 180–day disclosure deadline. That day, Broehm filed a motion to extend the deadline. Mayo opposed the extension and on February 17, filed a motion to dismiss Broehm's action. Both the extension and the dismissal motions were argued at a hearing before the district court on March 20. After the March 20 hearing, but before the issuance of the court's decision, Broehm submitted a "Supplemental Memorandum." This memorandum included the statement that Broehm wished to preserve the position that expert disclosure was not required because Broehm is entitled to a res ipsa loquitur jury instruction.[4]

The district court denied Broehm's request for an extension, concluding that she had failed to show good cause. The court then granted Mayo's motion to dismiss on the ground that Wick's qualifications failed to satisfy the requirements of section 145.682 (2004). Of particular importance to this concurrence is the fact that the court noted that Broehm had made no claim that Wick had training in the field of surgery or the sub-specialty of thoracic surgery. Nor was there a claim, the court observed, that Wick had assisted in tracheal resection surgery or the postoperative care for such surgery. The court then reviewed each of the four duties Mayo owed to Broehm that were identified in Wick's disclosure. The court concluded that Broehm "failed to provide the required expert witness affidavit that is likely to be admissible at trial." Broehm

---

4. In an attachment to this memorandum, Broehm disclosed another expert witness, Dr. William Portilla, in the form of an interrogatory answer. It appears the district court did not consider the memorandum or the disclosure. Broehm did not request permission at the motion hearing for supplemental briefing or submissions. The court of appeals granted Mayo's motion to strike Dr. Portilla's disclosure from the appellate record due to its untimely submission to the district court. We granted Mayo's motion to strike references to Dr. Portilla's disclosure from Broehm's materials before us.

appealed the extension denial and the dismissal. A divided panel of the court of appeals affirmed, but on slightly different grounds.

## I.

In its opinion, the majority fails to adequately address or explain why and how the district court abused its discretion in dismissing Broehm's malpractice action. The opinion summarily concludes that Wick is a nurse and therefore is qualified to provide an expert opinion in support of a nursing malpractice claim. Such a summary conclusion oversimplifies this case. As I shall explain in detail, the district court abused its discretion both by considering Mayo's rebuttal argument—an argument that frames Broehm's claim as one of malpractice for thoracic surgery—and by discounting Wick's characterization of the restraint as a dressing requiring nurses to inspect for skin integrity. The majority opinion leaves us wondering why the district court took the action it did and why the court of appeals disagreed with the district court. It is my hope that I can shed some light on this issue and explain what happened and provide some context when this case is considered upon remand.

### A. Requirements of Minn.Stat. § 145.682

I begin by addressing the district court's determination that the expert disclosure submitted by Broehm did not satisfy the requirements of Minn.Stat. § 145.682. As previously noted, the court's determination was based on its finding that Wick was not qualified to offer an expert opinion on the standard of care owed to a patient by a thoracic surgeon. We will reverse a district court's dismissal of an action for procedural irregularities only if the court abused its discretion. *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190 (Minn.1990) (citation omitted). However, statutory construction is a matter of law, which we review de novo. *Id.* (citation omitted).

Minnesota Statutes § 145.682 applies to any medical malpractice action that includes a cause of action for which an expert opinion is necessary to establish a prima facie case. Minn.Stat. § 145.682, subd. 2 (2004). The statute requires the plaintiff to serve two affidavits upon the defendant. *Id.* The first affidavit is one of expert review and must be served with the summons and complaint. *Id.* This affidavit must be signed by the plaintiff's attorney and affirm that the attorney has consulted with an expert whose qualifications provide a reasonable expectation that the expert's opinion would be admissible at trial. Minn.Stat. § 145.682, subd. 3. This expert review affidavit must state that, in the opinion of the expert, a breach of an applicable standard of care by the defendant resulted in the plaintiff's injury. *Id.* Section 145.682 does not require identification of the expert or a description of the expert's qualifications in this first affidavit.

The second affidavit required by section 145.682 must disclose the identity of each person the plaintiff expects to call as an expert witness at trial regarding malpractice and causation. Minn.Stat. § 145.682, subd. 4(a). The second affidavit must also disclose "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." *Id.* Section 145.682 allows interrogatory answers to be used as an alternative to disclosure by affidavit so long as the answers are signed by the expert witness and the plaintiff's attorney. *Id.* The plaintiff must serve the expert disclosure on the defendant within 180 days after commencing the action against the defendant, whether the disclosure is by affidavit or by interrogatory answers.

Minn.Stat. § 145.682, subds. 2 and 4(a). Broehm's disclosure of Wick's identity and opinion was made by an interrogatory answer served upon Mayo before the 180–day deadline expired.

At the time Broehm commenced her action, section 145.682 provided that failure to serve the expert disclosure before the deadline expired resulted, upon motion, in the mandatory dismissal with prejudice of each cause of action for which expert testimony was necessary to establish a prima facie case. Minn.Stat. § 145.682, subd. 6 (2000). As noted by the majority, the legislature has since amended section 145.682 to require that a defendant specify in its motion to dismiss any deficiencies in the disclosure and now allows dismissal only if the plaintiff has not corrected those deficiencies before the hearing on the motion to dismiss. Minn. Stat. § 145.682, subd. 6(c) (2004). Under the amended statute, the date for the hearing on the motion to dismiss must be at least 45 days from the date of service of the motion. *Id.*

We have described the purpose of section 145.682 as being to eliminate "frivolous" medical malpractice claims. *Sorenson,* 457 N.W.2d at 191. We concluded in *Sorenson* that the section's procedural dismissal mechanism "seems * * * to have been designed to deal only with cases completely unsupported by expert testimony." *Id.* To that end, the most important disclosure required by section 145.682 "is the *identity* of an expert who is willing to testify as to the alleged negligence." *Id.* (emphasis in original). We have, however, provided some guidance on the content requirements of the disclosure. Section 145.682 does not require a disclosure's contents to be highly detailed, but we held in *Sorenson* it was not enough for the expert disclosure to simply repeat the facts found in a medical record. *Id.* at 192. Rather,

the disclosure "should set out how the expert will use those facts to arrive at opinions of malpractice and causation." *Id.* at 192–93. Our decisions following *Sorenson* have elaborated on the content requirements of an expert disclosure. *See, e.g., Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 578 (Minn.1999) (holding an expert's affidavit was insufficient where it failed to provide a detailed statement of a standard of care and failed to outline a chain of causation connecting an alleged breach to an injury). *See also Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552, 555 (Minn.1996); *Anderson v. Rengachary,* 608 N.W.2d 843, 847–48 (Minn. 2000). But here, Mayo does not challenge the sufficiency of the *content* of Wick's disclosure, but only Wick's *qualification* to give an expert opinion.

The foregoing discussion of *Sorenson* and *Lindberg* and the following discussion of *Cornfeldt,* in addition to our holdings in *Stroud* and *Anderson,* clearly delineate our precedent and undermine the majority's undue reliance on *Teffeteller,* a 3–2 decision of our court. The majority overstates the requirements of Minn.Stat. § 145.682, subd. 4(a), when it states that a plaintiff must "strictly satisfy" the requirements of the statute or face dismissal of her claim. Such a "strict" interpretation undermines the purpose of section 145.682 which is to establish an initial threshold of credibility for medical malpractice cases in order to eliminate frivolous claims and appears to conflict with *Cornfeldt*'s standard for the qualification of expert opinion evidence; i.e., we do not limit expert opinion evidence to the one or few persons who are most qualified to give an expert opinion. *Teffeteller* cannot and should not be construed to impose such a requirement.

I am concerned that as a possible result of the majority's language, district courts may be tempted to be unduly vigilant in

screening out cases at too early a stage as happened in the case before us. The following quotation articulates the problems with having a court determine the admissibility of expert opinions at too early a stage in the litigation:

> Another problem with the expert opinion occurs when the testimony of the expert preparing the opinion must be admissible. It is difficult for trial courts very early in civil litigation to make such a determination. Regarding the trial court's "gatekeeping" responsibility in deciding upon the admissibility of expert scientific testimony, the U.S. Supreme Court has said: "[T]he trial court judge must determine at the outset * * * whether the reasoning or methodology underlying the testimony is scientifically valid * * * [and] whether that reasoning or methodology properly can be applied to the facts in issue." Such determinations at the outset of civil litigation are problematic because they may lead to excessive satellite litigation, as was often the case under the 1983 version of Federal Civil Procedure Rule 11. Additionally, the relevant factual issues may not have surfaced at such a preliminary stage.

Jefferey A. Parness & Amy Leonetti, Expert Opinion Pleading: Any Merit to Special Certificates of Merit? 1997 B.Y.U. L.Rev. 537, 586 (1997).

To be qualified to give an expert opinion in a medical malpractice case, a witness must have both sufficient scientific knowledge of and practical experience with the subject matter of the offered testimony. *Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn.1977). Those qualified to give expert opinion evidence are not limited to the one or the few persons who are *most* qualified to give an expert opinion. *Christy v. Saliterman,* 288 Minn. 144, 167, 179 N.W.2d 288, 303 (1970). Instead, a

witness who has training or skills concerning a particular subject may be heard as an expert on that subject; the value of the testimony is tested by cross-examination and ultimately determined by the jury. *Id.* In *Cornfeldt,* we held it was error to exclude the testimony of a chief nurse anesthetist in a medical malpractice claim against doctors "solely because he was not a licensed physician or because he did not graduate from medical school and had received only the training of a registered nurse anesthetist." 262 N.W.2d at 697. We reasoned that if the nurse had otherwise sufficient scientific and practical experience about the subject of his testimony, he would have been competent to give an expert opinion. *Id.* Consequently, an expert's academic or experiential qualifications usually go to the weight given to an opinion rather than to its admissibility. *Ruether v. State,* 455 N.W.2d 475, 477 (Minn.1990).

### B. Characterizing Broehm's claim

As I proceed with this analysis, it is important to first identify the subject or claim that Wick's opinion was intended to support because a witness's qualification to give an expert opinion is inextricably linked to the witness's knowledge of or experience with a particular subject. *See Cornfeldt,* 262 N.W.2d at 692. Mayo has characterized Broehm's claim as being one for thoracic surgeon malpractice and argues that Wick is not qualified to give an expert opinion on a thoracic surgeon's duty of care to a tracheal resection patient. In its argument, Mayo emphasizes the danger of suffocation and death against which the head restraint is designed to safeguard. Mayo contends that the restraint, as an essential element of postoperative care, is an extension of the thoracic surgery and thus represents specialized care that only Dr. Pairolero could provide or supervise. Therefore, Mayo asserts, a nurse with

Wick's training and experience is not qualified to give an expert opinion supporting a claim of thoracic surgeon malpractice.

In contrast, as developed in Wick's disclosure, Broehm's theory of the case focuses on the care and attention to the head restraint from the time it was constructed to the time Mayo staff discovered Broehm's injury two days later. Broehm characterizes her case as one of nursing or continuum of care malpractice. The testimony offered by Wick in the disclosure focuses on the claim that Broehm's injury was the result of skin necrosis from the restraint's pressure. One theory articulated by Wick is that the necrosis was caused by the application of adhesive tape to Broehm's forehead during the restraint's construction. Wick also articulates a second theory, in greater detail than the first, premised on an alleged duty of nursing staff to periodically inspect Broehm's skin under the restraint. According to this second theory, had Mayo's nursing staff properly inspected for skin integrity, Broehm's injury could have been prevented or could have been less severe. The district court apparently relied on Mayo's characterization of the case in assessing Wick's qualification to give an opinion on each of the four duties identified in the disclosure.

### C. Thoracic surgeon malpractice

Such reliance may have been proper in evaluating Wick's qualification to give an opinion on the asserted duties of a failure to obtain Broehm's informed consent to the use of the restraint and a failure to construct a head restraint device that did not cause an injury. Based upon the record before us, I conclude these first two duties were within the province of the surgeon performing the procedure and the personnel supervising and constructing the specialized restraint. Therefore, I agree with the majority's holding that the dis-

trict court did not abuse its discretion when it found Wick not qualified to give expert testimony in support of a claim based on the two foregoing duties of a thoracic surgeon.

### D. Duty to seek specialty care

The two other duties identified in the Wick disclosure—to inspect the restraint as if it were a dressing and to seek immediate specialty care once Broehm's injury was discovered—are not susceptible to a categorical pronouncement that Wick does not qualify as an expert. A duty to immediately seek specialty care may depend on the specific facts of a case. The duty may involve a nursing duty to properly respond to an injury as distinct from a physician's treatment decision. A duty to seek specialty care is a matter possibly within a nurse's practical training and experience such that a nurse should not be presumptively disqualified from giving an expert opinion. *See Cornfeldt*, 262 N.W.2d at 697 (holding that it was erroneous to exclude the expert testimony of a nurse in a malpractice action against doctors *solely* because the nurse did not have the similar credentials and education as the doctors). Nevertheless, Broehm's abbreviated disclosure of Wick's nursing experience does not demonstrate that Wick has sufficient practical experience to make her competent to give an expert opinion on an asserted duty to immediately seek specialty care. *Cf. id.* at 693, 697. Therefore, I would also conclude that the district court did not abuse its discretion when it found Wick not qualified to give an expert opinion to support a claim based on a duty to seek specialty care.

### E. Duty to inspect—nursing standard of care

I next consider the duty to inspect for skin integrity. Given that patients recov-

ering from surgery are entrusted to the care of nurses who have the responsibilities of attending to the immediate needs of patients and of monitoring their recovery, the duty to inspect for skin integrity would arise from a nursing standard of care.

At this point, I must note my concern about the district court's reasoning with respect to the duty to inspect for skin integrity. The court stated that it would have been against Dr. Pairolero's instructions for nurses to disturb the restraint. The court then asserted that the head restraint was "not a dressing or bandage" which would have made a nursing standard of care applicable, but rather a "device designed to prevent possible death." The court concluded that Wick, as a nurse practitioner, was not qualified "to recommend post-operative care for this type of surgery." In reaching this conclusion, the court disregarded Wick's opinion that the restraint "had the essential characteristics of a 'dressing,' so as to require adherence to the skin integrity and dressing inspection protocols."

Again, the district court's reasoning appears to flow from Mayo's theory of the case. By using this approach, the court erred in how it evaluated Wick's qualification to give an expert opinion on a duty to inspect for skin integrity. More particularly, this error resulted in the court's adopting Mayo's theory that this case is strictly one of thoracic surgeon malpractice as opposed to Broehm's nursing malpractice theory. The burden on Broehm was simply to make out a prima facie case of medical malpractice. In particular, Broehm had the burden to produce an expert whose opinion supported her claim. *See Sorenson,* 457 N.W.2d at 191 (stating the purpose of section 145.682's dismissal provision was to deal with cases "completely unsupported by expert testimony.").

The essence of a prima facie showing is that the plaintiff has presented facts and opinions that, *if uncontested,* would allow a decision in her favor. *Tousignant v. St. Louis County,* 615 N.W.2d 53, 59 (Minn. 2000). In *Tousignant,* we concluded that it was inappropriate for a court to focus on the defendant's rebuttal argument rather than on whether the plaintiff had established a prima facie case of medical malpractice. *Id.* at 60. Here, the court's adoption of Mayo's theory amounted to a consideration and weighing of the defendant's rebuttal argument. Doing so is contrary to the nature of the burden required of the plaintiff in a section 145.682 dismissal motion and therefore I conclude that the court abused its discretion in dismissing Broehm's claim on this basis. *Cf. Northern States Power Co. v. Franklin,* 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963) (holding that "A claim is sufficient against a motion to dismiss * * * if it is possible on *any evidence* which might be produced, *consistent with the pleader's theory,* to grant the relief demanded." (emphasis added)).

I also conclude that the district court abused its discretion when it explicitly rejected Wick's opinion that the restraint had the "essential characteristics of a 'dressing.'" In *Ruether,* our court held that a finder of fact "is not free to disregard unopposed medical testimony because such testimony concerns issues not within the realm of knowledge of the fact finder." 455 N.W.2d at 478 (citing *Olson v. Midwest Printing Co.,* 347 N.W.2d 43, 46 (Minn.1984)). There was no medical opinion other than Wick's concerning whether the restraint should have been construed to be a dressing. Whether the restraint had the characteristics of a dressing in terms of nursing or hospital protocol is outside of common knowledge and the court improperly discounted Wick's opinion. The opinion that the restraint was

essentially a dressing is an important premise of Wick's overall opinion. Unless Wick's opinion was contradicted by other evidence or was completely unreasonable, the court had to accept it and its implications for purposes of the motion to dismiss and, therefore, the court abused its discretion in summarily rejecting it.

Here, it is important to place in the correct context the district court's statement that checking the restraint "would be in direct disobedience of Dr. Pairolero's orders." At this stage in the litigation, the issue of Dr. Pairolero's instructing nursing staff not to disturb the restraint, in the context of Broehm's theory, may not eliminate a duty to inspect for skin integrity. Rather, it might only shift that inspection duty from nurses to Dr. Pairolero and therefore is an insufficient reason for finding that Wick was not qualified to testify regarding the appropriate standard of care. Therefore, for the foregoing reasons, I conclude that the district court abused its discretion when it found Wick not qualified to give an expert opinion to support a claim based on a nursing standard of care.

## F. Sufficiency of Wick's disclosure

Having concluded that the district court erred in how it viewed Wick's qualifications, the next step in the analysis is to consider Wick's qualification to give an expert opinion in support of Broehm's nursing malpractice theory. Although the Wick disclosure provides only a cursory recital of Wick's credentials, I agree with the majority that Wick's nursing experience and education provide a sufficient basis for her to be qualified to give an expert opinion about a nursing standard of care. Wick has worked as a nurse since 1984 and has attained a master's degree in nursing. Also, Wick's certification as a geriatric nurse and her current work in nephrology are not so narrow or nontransferable as to lead us to conclude that dressings, bandages, and skin integrity are treated dramatically different in those contexts. Nor does the record support such a conclusion.

Admittedly, a possible shortcoming of the Wick disclosure lies in its description of causation, which fails to explicitly articulate that the lack of inspections resulted in Broehm's pressure necrosis. This shortcoming, however, is not fatal because there are other detailed statements related to causation that provide a sufficiently clear understanding of Wick's proposed explanation of causation. Although it may be inartfully drafted, the Wick disclosure does not contain the kinds of "empty conclusions" that may be used to "mask a frivolous claim." *Teffeteller v. Univ. of Minnesota*, 645 N.W.2d 420, 428 (Minn.2002).

My aforementioned conclusions reflect the general deference that should be given to plaintiffs on a motion to dismiss. Our court has stated as an "incontestable proposition[ ]" that in a motion to dismiss "the facts alleged by complaint and affidavit are to be taken as true, and that the motion should not be granted unless the plaintiff fails to make out a prima facie case." *Hardrives, Inc. v. City of LaCrosse, Wis.*, 307 Minn. 290, 296, 240 N.W.2d 814, 818 (1976) (citing *Hunt v. Nev. State Bank*, 285 Minn. 77, 172 N.W.2d 292 (1969)). We have also held that it is immaterial whether the plaintiff can prove the facts alleged in a complaint. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 739 (Minn. 2000) (citing *Royal Realty Co. v. Levin*, 244 Minn. 288, 290, 69 N.W.2d 667, 670 (1955)). Even at a later stage in the proceeding, such as a motion for summary judgment, a court "must take the evidence in a light most favorable to the nonmoving party." *Fairview Hosp. v. St. Paul Fire & Marine*, 535 N.W.2d 337, 341 (Minn.1995)

(citing *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976)).

In *Sorenson*, we recognized that section 145.682's sanction of abrupt termination with prejudice of potentially meritorious claims runs counter to our traditional preference for disposing of claims on their merits. 457 N.W.2d at 192. We have encouraged district courts to "carefully evaluate the degree of prejudice to the defendant caused by the inadequate disclosures" and suggested less drastic alternatives to procedural dismissal in cases where a plaintiff identifies experts and gives some meaningful disclosure of what that testimony will be. *Id.* at 193 (citing *Dennie v. Metropolitan Med. Ctr.*, 387 N.W.2d 401, 406 (Minn.1986)). For these reasons, dismissal of Broehm's case on the grounds articulated by the district court does not further an interest in adjudicating claims on their merits. Therefore, for all of the reasons stated above, the district court's dismissal of Broehm's action for nursing malpractice on the ground that the Wick disclosure failed to meet the requirements of section 145.682 was an abuse of discretion.

## II.

Holding that the Wick disclosure meets the requirements of section 145.682 to the extent that Broehm may proceed with the nursing malpractice claim means that our affirmance of the district court's denial of an extension will not result in the complete dismissal of Broehm's action. Having met the section 145.682 deadline with one expert disclosure and thereby preserving the nursing malpractice cause of action, I note that a separate issue *may* arise. This issue is whether Broehm is permitted to later supplement or even replace the Wick disclosure with that of another expert—though still limited to the nursing duty to inspect the restraint as if it were a dressing.

Section 145.682 contains several possibly contradictory provisions regarding whether additional or substitute experts may be identified following the deadline for expert disclosure. Subdivision 4(a) requires the plaintiff to "state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation." Minn.Stat. § 145.682, subd. 4(a). However, subdivision 4(b) provides that "Nothing in this subdivision may be construed to prevent either party from calling *additional* expert witnesses or *substituting* other expert witnesses." Minn.Stat. § 145.682, subd. 4(b) (2004) (emphasis added). Also, subdivision 4(c) states:

> The court shall include in a scheduling order a deadline prior to the close of discovery for all parties to answer expert interrogatories for all experts to be called at trial. *No additional experts* may be called by any party without agreement of the parties or by leave of the court for good cause shown.

Minn.Stat. § 145.682, subd. 4(c) (2004) (emphasis added).

On January 11, 2002, Broehm and Mayo stipulated to the extension of a number of deadlines, including changing the deadline for designating expert witnesses from February 8 to April 8 on the condition "that Plaintiff must comply with the deadline in Minn.Stat. § 145.682, subd. 2(2) unless such deadline is extended by agreement of the parties or by leave of court as provided by Minn.Stat. § 145.682, subd. 4(b)."

Both the law and the facts of this case raise significant questions as to how the parties are to proceed upon remand. Nevertheless, I believe that it is imprudent for us to render any opinion, either explicit or implicit, on any other provisions of section 145.682 because no issue relating to the

interplay of those provisions is properly before us. Accordingly, I would have the court's opinion state explicitly that these other issues are not being addressed by the court.

## CONCURRENCE

PAGE, Justice (concurring).

I concur in the court's analysis and the result reached with respect to a nurse's qualifications to offer an expert opinion with respect to a duty to inspect for skin integrity and with respect to Broehm's nursing malpractice theory.[1] What is not clear to me is why the construction (in the sense of how it was put in place and not how it was designed) of the restraint here, which the court concedes has the "essential characteristics of a dressing," does not fall within Broehm's nursing malpractice theory given that a nurse is often the one applying or changing dressings. It is also not clear to me why Wick is not qualified to offer an expert opinion regarding necrosis of the skin resulting from the application of the restraint at issue here. It seems to me that nurses are uniquely qualified to offer expert testimony regarding necrosis resulting from the application of such a dressing. Finally, it is not clear to me why any expert opinion is necessary with respect to the doctor's duty to construct a restraint that does not cause injury.

1. While this case has been characterized as a thoracic surgery malpractice claim, that characterization is misleading. The claimed malpractice only involves the taping of the restraint to Broehm's forehead and the failure to inspect that tape.